**Wendolyn LaFLEUR, Plaintiff,**

v.

**WALLACE STATE COMMUNITY COLLEGE, et al.,
Defendants.**

**Civil Action No. 94–D–747–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 18, 1996.

Anita L. Kelly, Kenneth L. Thomas, Montgomery, AL, for plaintiff.

Edward M. George, Harry A. Lyles, Jeffery A. Foshee, Montgomery, AL, James R. Knight, Cullman, AL, Renee Culverhouse, Office of Atty. Gen., Montgomery, AL, for defendants.

## MEMORANDUM OPINION

DE MENT, District Judge.

Plaintiff Wendolyn LaFleur, a black female, brought this race discrimination action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e17, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983. The plaintiff, a former business education instructor at Wallace State Community College ("Wallace College") in Hanceville, Alabama, claims that Wallace College and its President, Dr. James C. Bailey,[1] discriminated against her because of her race when they refused to renew her nine-month probationary contract of employment.[2] The plaintiff seeks declaratory and injunctive relief, reinstatement, back pay and lost benefits, as well as attorneys' fees and costs.

The court presided over a three-day bench trial in this case on July 12–14, 1995, at which time the parties presented oral testimony and introduced numerous exhibits into evidence. After careful scrutiny of all the evidence as applied to the applicable law, the court finds in favor of the plaintiff and against the defendants. Pursuant to Rule 52(a) of the *Federal Rules of Civil Procedure*, the court hereby enters its Findings of Fact and Conclusions of Law.

---

1. The plaintiff's claims for race discrimination are asserted against Dr. James C. Bailey individually and in his official capacity as the one responsible for the acts of his employer and/or employees.

2. In her complaint, the plaintiff also named as defendants the Chancellor of Postsecondary Education, Dr. Fred Gainous, as well as the members of the Alabama State Board of Education in their official capacities. By joint agreement of the parties filed May 30, 1995, however, these defendants were dismissed as party-defendants.

## JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e–5(f)(3). The parties do not contest personal jurisdiction or venue. Furthermore, the court finds that the plaintiff has fulfilled the two jurisdictional prerequisites for instituting a Title VII lawsuit. The plaintiff timely filed a charge with the Equal Employment Opportunity Commission ("EEOC"), wherein she asserted a claim of race discrimination. Furthermore, after receiving a right-to-sue letter from the EEOC, the plaintiff seasonably filed this action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973).

## STANDARD OF REVIEW

■ The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir.), *cert. denied*, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not true." *See* Pattern Jury Instructions (Civil Cases) of the District Judges Assoc. of the Eleventh Circuit, Basic Instruction No. 6.1 (1990).

In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir.1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

■ Moreover, "a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or exclusion of evidence." *Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir.1979) (citing *Wright v. Southwest Bank*, 554 F.2d 661 (5th Cir. 1977)). *See also Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 776 n. 5 (11th Cir. 1982) (stating that the court has "broad discretion over the admission of evidence in a bench trial").[3]

## FINDINGS OF FACT

Defendant Wallace State Community College ("Wallace College"), located in Hanceville, Alabama, is a State of Alabama public institution of postsecondary education. *See* Ala.Code § 16–60–110 (1996). Since the inception of Wallace College, the majority of the faculty members have been white, and, during the 1992–93 academic year, four of the ninety-two faculty members were black. Since 1975, Wallace College has been under federal court orders to actively recruit qualified black applicants for full-time faculty positions.

Defendant James C. Bailey ("President Bailey"), a white male, is President of Wallace College and acts as its employing authority. He has served in this capacity since 1971.

In January 1992, Wallace College announced a job vacancy for the position of "Professor of Business & Secretarial Science," which listed the following qualifications: "Masters degree required[;] 18 hours graduate semester hours in field[;] Work experience in field[;] Instructional experience preferred[.]" Pl.'s Trial Ex. 3. The job announcement listed the "Salary Range" as "9 months = $20,686–$39,120—Salary based on level of formal education, work experience, and number of years full time teaching experience."[4] *Id.*

---

3. In light of these principles, the court overrules the plaintiff's objections to the admission of the defendants' Trial Exhibits 5 and 8.

4. The salaries for all full-time instruction positions at Wallace College must comply with the D

Salary Schedule established by the Alabama State Board of Education ("Salary Schedule"). *See* Ala.Code § 16–11–17 (1996); Pl.'s Trial Ex. 4.

In response to this announcement, the plaintiff applied for the position by letter dated March 23, 1992. It is undisputed that the plaintiff met the advertised requirements for the position of Professor of Business and Secretarial Science: (1) She had received a Bachelor of Science Degree in Business Education and also a Master of Science Degree in Business Education from Alabama A & M University, as well as a Doctor of Philosophy Degree in Business Administration from the American University of Science and Technology; (2) she had at least the equivalent of eighteen semester hours of graduate study in the field of business and/or business education; and (3) she had instructional and work experience in field.

The Academic Dean, Dr. Robert Guthery ("Dean Guthery"), interviewed the plaintiff in person on at least three occasions and also corresponded with her several times by telephone and through the mail. Dean Guthery's job duties included the recruitment and recommendation for employment of faculty.[5] During her first interview, the plaintiff met with Dean Guthery, and he addressed the job requirements, hours of employment, work schedule and salary. Subsequently, the plaintiff met with Dean Guthery and President Bailey, during which time she discussed her academic training and background. During a third meeting, the plaintiff met with Dean Guthery and JoAnn Hathcoat ("Ms. Hathcoat"), the chairperson of the Business Education Department. Ms. Hathcoat inquired about the plaintiff's computer skills and reviewed with her the fall teaching schedule. Both Dean Guthery and Ms. Hathcoat are white.

Dean Guthery was favorably impressed with the plaintiff during the interview process. In fact, both President Bailey and Dean Guthery testified that they wanted to hire the plaintiff. Hence, the plaintiff was offered and accepted employment in the Spring of 1992 for the 1992–93 academic year. When the plaintiff was hired, the appropriate deans and department heads submitted hiring recommendations to the President of Wallace College. Hence, the court may reasonably infer, and so finds, that both Dean Guthery and Ms. Hathcoat participated to some extent in President Bailey's decision to offer the plaintiff the position.

Wallace College hired the plaintiff under a nine-month contract as a Professor of Business and Secretarial Science for the first three academic quarters of the 1992–93 academic year. The plaintiff was the only black person ever employed in an instructional capacity in the Business Education Department. During the plaintiff's employment, Ms. Hathcoat was the plaintiff's immediate supervisor.

The plaintiff was employed pursuant to the Revised Hearing Procedure of the State Board of Education. Under the Revised Hearing Procedure, full-time instructors are hired for contracts of three, nine, or twelve months and are on probationary status for three years from the date of initial employment. During the three-year probationary period, the instructor's employment contract may be nonrenewed with or without cause at the end of any contract, upon written notice of nonrenewal to the employee at least fifteen days prior to the end of the contract.

The court heard extensive testimony about an ongoing and vigorous dispute between the plaintiff and Wallace College administrators regarding her salary. According to the plaintiff, the salary listed in her teaching contract ($29,288) was approximately $7,000 less than Dean Guthery had represented during her initial employment interview. In an attempt to resolve the problem with her placement on the Salary Schedule, the plaintiff had at least one face-to-face meeting with Dr. Karen Stanfield,[6] at least one meeting

---

5. At all times during the plaintiff's employment at Wallace College, Dr. Guthery was Academic Dean. He retired from employment with Wallace College following the 1992–93 academic year.

6. Dr. Karen Stanfield, Assistant to President Bailey in 1992, was given the specific responsibility to review the plaintiff's academic credentials and place her on the correct salary rank and step. It is undisputed that a Wallace College administrator evaluates each new instructor's academic credentials and relevant work experience for purposes of salary placement.

with Dean Guthery and Dr. Jerry Galin,[7] and at least two meetings with President Bailey.

The court finds that the details of this salary dispute are unimportant for resolution of this lawsuit. It is important, however, that the continued argument about the plaintiff's salary created intense friction and tension between the plaintiff and Wallace College administrators. This dispute may be summarized as follows: During the plaintiff's initial hiring interview, Dean Guthery represented to the plaintiff that he thought she would qualify for Rank IV, Step 10 placement on the Salary Schedule ($36,720). At trial, Dean Guthery testified that his statement was based upon an erroneous assumption that the plaintiff's Ph.D. was from an accredited graduate school.[8] However, when he later received her transcripts, he learned that the institution from which the plaintiff had earned her Ph.D. was not accredited by the Southern Association of Colleges and Schools and, thus, she was not eligible for a Rank IV placement.[9] Dean Guthery then represented to the plaintiff on October 7, 1992, that based upon her unverified application information, she was eligible for placement at Rank II, Step 10 ($31,490). However, after further review, Dr. Stanfield determined that the plaintiff could only be placed at Rank I–A, Step 10 on the Salary Schedule ($29,288). Dean Guthery informed the plaintiff by memorandum dated November 6, 1992, that she would be paid based upon this placement.

At trial, the plaintiff testified that, irrespective of the fact that her Ph.D. was from an unaccredited institution, two other factors should have qualified her for a higher step and rank placement. That is, the plaintiff stated that Wallace College should have considered her year of teaching at Tennessee Valley College. Additionally, the plaintiff testified that Wallace College refused to take into account the purported extra hours that she taught during the fall semester.

Michael Golden ("Mr. Golden"), a white male whose contract was nonrenewed after the 1993–94 academic year, testified that negotiations over pay raises were "not uncommon." Trial Transcript at 402. He stated: "[I]t's almost considered a ritual [that] when it's time for a pay raise[,] ... you are going to have to fight for it. You are going to have to prove beyond a shadow of a doubt that you are entitled to a pay raise." *Id.* To the extent that Mr. Golden testified that the plaintiff was treated differently than white faculty members with regard to her pay dispute, the court has not considered this testimony. It was apparent that Mr. Golden was not familiar with the nature and depth of her pay dispute.[10]

The defendants assert that the accumulation of the salary dispute plus the following other problems led to the decision to nonrenew the plaintiff's contract:

(1) When President Bailey and Dean Guthery scheduled a meeting with the plaintiff on November 9, 1992, to discuss her salary placement, she did not attend. According to President Bailey, it is unacceptable for employees to miss scheduled meetings unless there is a good reason for the absence. It is undisputed that this scheduled meeting occurred after several failed attempts to resolve the salary dispute. The court credits

**7.** During the plaintiff's employment, Dr. Jerry Galin (a white male) was the Dean of Faculty Development.

**8.** The court notes that Dean Guthery's representation was based upon more than an assumption. Dean Guthery has worked in the educational field for more than thirty years and lived less than an hour from the institution where the plaintiff obtained her "Ph.D." Yet, he had never heard of the university and admitted that he suspected that the plaintiff's "Ph.D." probably was not a "bona fide" degree. Trial Transcript at 263–67. The court concludes with emphasis that at least a portion of the problem in this case was the manner in which the plaintiff was hired.

**9.** It is undisputed that neither the plaintiff nor Dean Guthery discussed the issue of accreditation during the plaintiff's interviews.

**10.** At trial, in response to the court's questions, Mr. Golden answered as follows:

Q. Do you know what the dispute over the pay was that she was having?
A. Not the exact situation, but it had to do with the amount of pay.
Q. That's all you know about it?
A. Yes, sir, about it.
Trial Transcript at 403–04.

the plaintiff's testimony and finds legitimate her reason for not attending. That is, the plaintiff, at this point, was hopelessly frustrated and believed that another meeting would only prove futile. The court, however, believes that as a matter of professional courtesy, a more appropriate course of action would have been for the plaintiff to notify President Bailey and Dean Guthery in advance that she would not be present for the meeting.

(2) Ms. Hathcoat testified that, except for the fall semester in 1992, when the plaintiff was teaching a fifth class, the plaintiff was scheduled to work every Friday from 7:45 a.m. until 3:15 p.m. Nonetheless, Dean Guthery stated that she did not adhere to her working schedule. He further testified that, even after he sent her a memorandum dated November 17, 1992, regarding Wallace College's policy that instructors could only receive one-half day credit for teaching an evening class, she continued to take off all day on Fridays without prior or concurrent approval.

The plaintiff testified that, during the initial interview, Dean Guthery represented that she would work four days a week and have off every Friday. According to the plaintiff, this was her reason for not coming to work on Fridays.

(3) Dean Guthery testified that he personally observed the plaintiff's absence on numerous occasions. That is, he stated that the plaintiff was absent on the following days without prior written approval: (1) all day on Friday, April 23, 1993; (2) all day on Friday, May 21, 1993; (3) all day on Friday, May 28, 1993; (4) 3¼ hours on Wednesday, June 2, 1993; (5) 3¼ hours on Thursday, June 3, 1993; (6) all day on Friday, June 4, 1993; and (7) all day Monday, June 7, 1993.

(4) The defendants state that it was common practice for business instructors to teach five courses per quarter and that the plaintiff was the only instructor who insisted on being paid extra for teaching a fifth class.

Despite this common practice, the defendants paid her an extra $833.30 for teaching a fifth class, even though it technically was not an "overload" class taught outside her normal 35-hour week.

(5) Dean Guthery did not consider the plaintiff a "team player."

(6) Dean Guthery testified that his experience had indicated that employees tend to be on their best behavior during their first year of employment. When, as here, an employee causes problems for Wallace College in the first year of employment, he stated that the employee's behavior tends to worsen over the history of that employee's employment at Wallace College. Hence, Dean Guthery made a determination based on the plaintiff's continual disputes over her compensation and her purported dissatisfaction with Wallace College that it would be in the best interest of Wallace College not to renew her contract.

(7) Although all faculty members with two years or less service at Wallace College were required to participate in the Spring graduation ceremony, the plaintiff did not attend.

In accordance with the Revised Hearing Procedure, Dean Guthery timely advised the plaintiff by letter dated May 14, 1993, that her teaching contract would not be renewed for the 1993–94 academic year. The evidence is conflicting regarding the individuals responsible for the decision to nonrenew the plaintiff's teaching contract.[11] In the Defendants' Answers to Plaintiff's Interrogatory No. 21, the defendants stated that the decision was made by the following individuals: (1) President Bailey; (2) Dean Guthery; (3) Dr. Galin; and (4) Ms. Hathcoat.

The court finds credible the testimony of President Bailey, who testified that Dean Guthery and Ms. Hathcoat made the decision to nonrenew the plaintiff's teaching contract. While Dean Guthery testified that he was solely responsible for the decision of nonrenewal, his testimony corroborates President Bailey's in regard to Dean Guthery's

---

11. The stipulation of facts submitted by the parties indicates that the decision not to renew the plaintiff's employment contract at Wallace College for the 1993–94 academic year was made solely by Dean Guthery. The plaintiff, however, made clear at trial that she rejected this stipulation and all others relating to the individuals responsible for the decision to nonrenew her contract.

own participation in the decision. The court further finds not credible and rejects Ms. Hathcoat's testimony denying any participation in the decision to nonrenew the plaintiff's contract. In sum, after hearing all of the testimony, the court finds that Dean Guthery and Ms. Hathcoat were two of the individuals who recommended nonrenewal of the plaintiff's contract and that President Bailey, in essence, "rubber-stamped" the recommendation.

Although neither Dean Guthery nor Ms. Hathcoat personally observed the plaintiff's classroom teaching performance, Wallace College officials had no reason to believe that the plaintiff's performance as a classroom instructor was not generally satisfactory. During the 1992–93 academic year, neither the plaintiff nor any other business education instructor received a formal written evaluation by an administrator of Wallace College. In fact, the only teaching evaluation methods in place at that time consisted of written self-evaluations and student evaluations. The defendants assert that the plaintiff was absent on the day in June when the faculty self-evaluation forms were distributed. In defense, the plaintiff testified that she was not present because prior to this date (May 14, 1993), she had received her nonrenewal notice.

The only document containing information about the plaintiff's teaching abilities is a "Teacher Effectiveness Validation Form." Ms. Hathcoat completed and signed this form on December 5, 1992, in order to help the plaintiff get into a graduate education program. Therein, Ms. Hathcoat gave the plaintiff the highest ranking—"excellent"—in all four areas of evaluation, which included "Personal Qualities," "Work Habits," "Competence" and "Potential." Pl.'s Trial Ex. 19.

Wallace College hired Susan Smith, a white female, to fill the vacancy left by the plaintiff. Ms. Smith had a Master of Science degree and Ed.S. degree in business education and had expressed an interest in teaching at Wallace College "for quite a num-ber of years" before she was hired. Trial Transcript at 319–20 & 326.

The defendants also state that the following evidence reveals that the nonrenewal of the plaintiff's contract was not based upon race considerations:

(1) Dean Guthery's testimony that he was very pleased to receive the plaintiff's application, because historically, very few black individuals applied for instructor positions at Wallace College.

(2) Testimony that the plaintiff's salary placement was not evidence of race discrimination but rather was based upon a misunderstanding about the plaintiff's credentials.

(3) President Bailey's testimony that Wallace College desired to pay the plaintiff the maximum salary possible under the rules of the State Board of Education.

(4) Dean Guthery's testimony that the defendants did not consider the plaintiff's race in determining whether or not to renew her contract.

(5) Evidence that, after the plaintiff was no longer employed at Wallace College, Ms. Hathcoat voluntarily signed a letter to the plaintiff's instructor in Course AHE 691, a clinical higher education experience, in which Ms. Hathcoat confirmed that the plaintiff had successfully completed her teaching experience at Wallace College.

(6) Ms. Hathcoat's "excellent" ratings of the plaintiff's abilities in the "Teacher Effectiveness Validation Form," discussed *supra.*

(7) Dean Guthery's testimony that he reprimanded instructors other than the plaintiff for non-adherence to office schedules.

(8) Ms. Hathcoat's testimony that, when the plaintiff's car broke down one night at a thrift store in Cullman County, Alabama, the plaintiff called her and she came and "jumped off" the plaintiff's car.

The plaintiff testified that, during her employment, Ms. Hathcoat subjected her to numerous comments with racial overtones. First, the plaintiff stated that Ms. Hathcoat "constantly" told her that she needed to leave Cullman County before dark because black people did not belong there.[12] Trial

---

12. The plaintiff lived in Huntsville, Alabama, and commuted to Hanceville, Alabama, which is in Cullman County.

Transcript at 456 & 458. The plaintiff stated that this comment "bothered" her a "whole lot" because she taught a night class and that, as a result, she always tried "to get out" of Cullman County "as quick as [she] could." *Id.* Mr. Golden also stated that he heard Ms. Hathcoat tell the plaintiff not to "be in Cullman after dark because there used to be a sign at the city limits that read[ ] 'nigger, don't let the sun set on your ass.'" *Id.* at 405. Second, the plaintiff testified that Ms. Hathcoat told her, in a "threatening manner," that the Klu Klux Klan was "alive and well" in Cullman County. *Id.* Third, the plaintiff testified that Ms. Hathcoat instructed her that, if she moved to Cullman County, she would have to live in the "Colony," because that was the only community where blacks could live. *Id.* at 455. Fourth, according to the plaintiff, Ms. Hathcoat told her on several occasions and once in the presence of Mr. Golden that blacks did not go to flea markets for fear that they would be "sold off." *Id.* at 457. Mr. Golden confirmed that he heard Ms. Hathcoat make this statement about flea markets. *Id.* at 404–05.

Fifth, Ms. Hathcoat one day observed the plaintiff wearing an elephant pendant on her clothing and told her that she initially thought that perhaps the plaintiff was a Republican. Ms. Hathcoat then stated, however, that "blacks are not Republicans." *Id.* at 455. Sixth, the plaintiff testified that Ms. Hathcoat told her that her "life didn't mean anything in Cullman" because she is black and that white people in Cullman County would rather "lynch" her than "do [her] right." *Id.* at 460–61. The plaintiff did not consider any of the remarks to be merely "jokes." *Id.* at 457.

Mr. Golden further testified that, regarding Ms. Hathcoat's comment about flea markets, Katherine Maddox and Terri Jo McGriff also heard Ms. Hathcoat make this statement. Ms. Maddox, a former part-time instructor at Wallace College, did not recall Ms. Hathcoat's purported statement and likewise did not recall any racial remarks made by Ms. Hathcoat concerning the plaintiff.

Ms. McGriff, a current full-time instructor at Wallace College, similarly testified that she did not hear this comment about a flea market or any other racial remarks directed toward the plaintiff. Ms. Hathcoat denied making any of the statements attributed to her by the plaintiff and Mr. Golden.

The court carefully observed the demeanor of all the witnesses who offered testimony regarding Ms. Hathcoat's racial comments. The court finds credible the plaintiff's testimony but questions the truth and veracity of Ms. Hathcoat's denials. The court also finds credible Mr. Golden's corroboration. The court, however, did not find very persuasive either Ms. Maddox or Ms. McGriff's failure to recall the remarks attributed to Ms. Hathcoat. The court further notes that, according to defense counsel (Mr. James R. Knight), Ms. McGriff considers Mr. Knight a "father figure." *Id.* at 518. Additionally, the court notes that, when she testified, Ms. McGriff was presently employed at Wallace College and worked with Ms. Hathcoat.

### CONCLUSIONS OF LAW

The court will first analyze the merits of the plaintiff's race discrimination claims. The defendants also have raised several defenses to the plaintiff's causes of action, such as Eleventh Amendment immunity under § 1983 and the unavailability of individual-capacity suits under Title VII. Because these defenses do not wholly dispose of either claim but rather affect the availability of remedies, the court will address these defenses in the remedies section of this opinion, *infra.*

### I. The Merits of the Plaintiff's Causes of Action

█ The plaintiff brings her claims under Title VII and 42 U.S.C. § 1983. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is the predicate for the plaintiff's claim for recovery under § 1983.[13] An employee may sue his or her public employer under both Title VII and § 1983 when the § 1983 violation rests on a

---

**13.** The Equal Protection Clause provides the plaintiff "a right to be free from racial discrimination." *Busby v. City of Orlando,* 931 F.2d 764,

775 (11th Cir.1991) (citing *Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976)).

claim of infringement of rights guaranteed by the United States Constitution. *Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805 (11th Cir.1995); *see also Lightner v. City of Ariton, Ala.,* 884 F.Supp. 468, 470–71 (M.D.Ala. 1995) (De Ment, J.).

■ Both causes of action seek redress for a single incident: the nonrenewal of the plaintiff's nine-month probationary employment contract. Because the proper allocation of burdens and proof in a circumstantial evidence case based on § 1983 is the same for a case based on Title VII, the court need not address the § 1983 claim separately from the Title VII claim. *Richardson,* 71 F.3d at 805; *Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir.1985). Under Title VII and § 1983, the plaintiff's ultimate burden of proof requires a showing by the preponderance of the evidence that the defendants "acted with discriminatory intent." *Richardson,* 71 F.3d at 805.

■ The plaintiff's claims are premised upon a disparate treatment, as opposed to a disparate impact, theory of liability.[14] In an action alleging disparate treatment, a plaintiff may prove a racially discriminatory intent by either direct or circumstantial evidence. *Lee,* 684 F.2d at 773. The plaintiff seeks to prove her case by circumstantial evidence. Direct evidence is not at issue.

Where the evidence is circumstantial, a plaintiff establishes intentional discrimination under a variation of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Com-*

*munity Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[15] *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 518, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993). Under this framework, the plaintiff must first raise an inference of discrimination by establishing a prima facie case. *Batey v. Stone,* 24 F.3d 1330, 1333 (11th Cir.1994) (citation omitted). The court finds that the analysis used in evaluating discriminatory discharge claims governs the plaintiff's prima facie proof of race discrimination in the nonrenewal of her nine-month probationary contract. *Lee,* 684 F.2d at 773. (In determining whether the nonrenewal of an untenured teacher's contract was based upon race considerations, the Eleventh Circuit applied the prima facie case used in discriminatory discharge cases.); *Richardson,* 729 F.Supp. at 810 (same). Hence, the plaintiff must prove by a preponderance of the evidence: (1) that she belongs to a protected class; (2) that she was qualified for the position held; (3) that she was discharged despite her qualifications; and (4) that she was "replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained...." *Lee,* 684 F.2d at 773 (citations omitted). In establishing the elements of her prima facie case, the plaintiff's burden is "minimal." *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 (11th Cir.1994).

■ The court finds that the plaintiff has met her initial burden. The plaintiff is black and, thus, is a member of a group protected by the anti-discrimination laws at issue in this case. The defendants concede that,

14. To succeed on a disparate impact theory of liability, a plaintiff must show that a policy or practice that appears neutral on its face, in fact, has a disparate impact or effect on a protected class. *See Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

15. After the trial on the merits of a disparate treatment action, as here, "the court need not employ the full [*McDonnell Douglas*] analysis, but may simply proceed directly to the ultimate issue of discrimination." *Richardson v. Lamar County Bd. of Educ.,* 729 F.Supp. 806, 810 (M.D.Ala.1989), *aff'd,* 935 F.2d 1240 (11th Cir. 1991) (citations omitted). However, where the plaintiff's case is based upon circumstantial evi-

dence, the trial court should analyze each prong of the three-part test. As set forth in *Richardson,* circumstantial evidence cases

"... pose difficult and sensitive issues of subjective intent and objective action. The [*McDonnell Douglas*] analysis provides an invaluable method of weighing and considering evidence. By focussing the court's inquiry on the prima facie case, the employer's justification, and the issue of pretext, [*McDonnell Douglas*] helps to assure that the court arrives at its ultimate conclusion less through intuition and more through factual reasoning and analysis."

*Id.* at 809 (quoting *Dunning v. National Indus., Inc.,* 720 F.Supp. 924, 929 n. 7 (M.D.Ala.1989)).

when hired, the plaintiff met the advertised requirements for the position of Professor of Business and Secretarial Science. The defendants, however, assert that in evaluating the plaintiff's qualifications, the court must focus on whether, at the time of nonrenewal, "she was capable of performing the job at a level that met the President's reasonable expectations." Def.s' Post Trial Brief, filed Jan. 5, 1996, at 13–14. The court finds that the defendants' purported dissatisfaction with the plaintiff's performance, discussed *infra*, does not affect her prima facie case but, rather, is relevant to the defendants' burden of articulating a legitimate, nondiscriminatory reason for not renewing the plaintiff's contract. *But see Hill v. Seaboard Coast Line R.R. Co.*, 885 F.2d 804, 808–10 (11th Cir.1989) (stating that the Eleventh Circuit has never "held that a plaintiff need meet only the employer's objective criteria in order to establish [the qualified] prong of a prima facie case" and that, based upon the facts before it, the applicant's failure to possess the required aptitude, intellect, and communication skills rendered the applicant unqualified). In the alternative, because the court rejects the evidence of the plaintiff's purported deficiencies asserted as the defendants' rebuttal, the court finds that it need not consider these factors in determining the plaintiff's qualifications.

Additionally, the defendants employed a white person, Ms. Smith, to fill the plaintiff's position. The court finds that the plaintiff was at least as qualified as Ms. Smith to perform the responsibilities of a business instructor at Wallace College. *Hill*, 885 F.2d at 809–810 (holding that "[a] plaintiff may establish a prima facie case even if he [or she] shows that the non-minority employee selected was equally as well qualified; he [or she] need not show, as part of his [or her] prima facie case, that his [or her] qualifications exceeded those of the non-minority employee") (citation omitted) (brackets added).

The burden then shifts to the defendants to "articulate some legitimate, nondiscriminatory reason" for their decision not to renew the plaintiff's contract. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendants' burden is "exceedingly light," *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir.1983), as they "must merely proffer [race-neutral] reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). The proffered reason for the employer's action, however, must be reasonably specific and clear. *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. The defendants contend that the decision not to renew the plaintiff's contract was based upon the plaintiff's academic credentials, non-adherence to her work schedule and general incompatibility with Wallace College administrators. The court finds that these reasons satisfy the defendants' burden.

Once a defendant satisfies its burden of production, the *Burdine* framework, with its presumptions and burdens, drops out of the case, and the only inquiry becomes "whether [the] plaintiff has proven 'that the employer intentionally discriminated against' [her] because of [her] race." *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749 (citation omitted). In other words, at this stage of the analysis, the plaintiff's burden of establishing pretext merges with the plaintiff's ultimate burden of proof of intentional discrimination.[16] *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

---

**16.** *St. Mary's* slightly modified the Title VII disparate treatment framework. Previously, a plaintiff could satisfy his or her Title VII burden of proof "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.1992) (The plaintiff satisfied her burden by showing that the employer's reasons were unworthy of

credence.); *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554 (11th Cir.1990) (same). In other words, "the falsity of the employer's explanation [was] *alone enough* to compel judgment for the plaintiff." *St. Mary's*, 509 U.S. at 517, 113 S.Ct. at 2752 (emphasis supplied).. In *St. Mary's*, however, the Supreme Court ruled that the plaintiff must show by a preponderance of the evidence "*both* that the reason was false, *and* that discrimination was the real reason" ... and "it is not enough ... to disbelieve the employer...." *Id.* at 512 n. 4, 113 S.Ct. at 2750 n. 4 (emphasis supplied).

While the court acknowledges that the plaintiff was not a model employee, the court concludes that more likely than not race was the primary reason for nonrenewing the plaintiff's contract. The plaintiff has presented credible evidence that Ms. Hathcoat, whom the court has previously determined played a role in the decision to nonrenew the plaintiff's contract, harbored racial prejudices. As previously described, Ms. Hathcoat degraded the plaintiff by equating flea markets with slave auctions, by impliedly threatening the plaintiff with references to the Klu Klux Klan, and by essentially telling the plaintiff that she was worthless because of her race. The court finds that these racial remarks were made, with the obvious but perhaps unthinking purpose, to demean the plaintiff and were commonplace during her employment at Wallace College. Racial statements made by supervisors can create an inference of discrimination. *See Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir.1985).

Nevertheless, the court credits President Bailey's testimony that the plaintiff caused quite a disturbance over her salary and that, therefore, she was a source of constant irritation to him. The court also believes President Bailey's testimony that he wanted to pay the plaintiff the highest possible salary. The court further believes that he, in good faith, attempted to resolve the dispute amicably and that his final conclusion that her proper placement was Rank I–A, Step 10 was not based upon racially discriminatory reasons.

However, the court also is convinced that other evidence, in conjunction with the racial slurs made by Ms. Hathcoat, leaves race as the motivating explanation for the nonrenewal of the plaintiff's contract. First, the plaintiff was the only black instructor ever employed in the Business Education Department, and it is clear by Ms. Hathcoat's racial slurs that the plaintiff's presence disrupted the normal operations of the otherwise white faculty-run department. Second, credible evidence reveals that based upon the plaintiff's previous employment experiences and academic credentials, she was more than qualified for the instructor position which she occupied. Additionally, it is undisputed that

the plaintiff's teaching skills were satisfactory, if not excellent. Third, the court stresses that the lack of objective evaluation methods creates a fertile environment for racially discriminatorily practices and can raise an inference of discrimination. *See Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir.1985), wherein the Eleventh Circuit, although affirming the trial court's finding of no discrimination, noted that subjective methods of evaluation were very relevant as to pretext determinations. Fourth, the decision to not renew the plaintiff's contract was made by all white supervisory officials. As the former Fifth Circuit explained, "subjective judgments" about black employees "are suspect ... when they are exercised by members of an all-white executive or supervisory staff." *Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1026 n. 21 (5th Cir.1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982).

Fifth, the court finds that the reasons proffered for the nonrenewal of the plaintiff's contract, being purely subjective, are suspicious and further support an inference of discrimination. To the extent that nonadherence to her teaching schedule is offered to demonstrate a reason for not renewing the plaintiff's contract, the court finds that this reason simply is not believable. Dean Guthery admitted that he "frequently" reprimanded other white instructors but could not "recall" if any of them were discharged or their contracts nonrenewed. Trial Transcript at 258–259. The court further finds that the plaintiff's ongoing dispute about her salary is not a credible reason for nonrenewing her contract, as this contention is not supported by the evidence. Dean Guthery, in his own words, testified that he did not "blame her for seeking a higher salary." *Id.* at 262. In fact, he stated that he understood her concern based upon his representation during the initial interview that her salary would be higher than she actually received.

Moreover, any reliance on the fact that the plaintiff received her Ph.D. degree from a non-accredited university as a reason for nonrenewal likewise is not credible. Not only is it undisputed that a Ph.D. was not a requirement for the position of Professor of

Business and Secretarial Science, but also the issue of school accreditation was never discussed during any of the plaintiff's hiring interviews. The court concludes that if accreditation was of primary concern to the defendants and could result in nonrenewal, then the defendants would have, or should have, inquired and/or included such a requirement on the job announcement.

The court further finds that the plaintiff has presented trustworthy evidence that the defendants treated the plaintiff differently than white employees. Unambiguous racial epithets, particularly when uttered by an employee's supervisor, as here, "automatically separate[ ]" a black employee from every non-black employee. *Bailey v. Binyon*, 583 F.Supp. 923, 927 (N.D.Ill.1984). In the court's opinion, the racial comments, some of which were unrebutted and corroborated (other than Ms. Hathcoat's denial), when combined with the aforementioned evidence, constitute strong circumstantial evidence from which an inference of blatant, open racial discrimination may be drawn. In light of this evidence, the purported race-neutral reasons for nonrenewal become transparent and reveal underneath a racial animosity.[17]

■ Moreover, the court finds that Wallace College may be held accountable for race discrimination accomplished through Ms. Hathcoat, whom the court has determined possessed the authority to recommend the nonrenewal of the plaintiff's contract. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Finally, the court notes that in finding race discrimination, it has been sensitive to the fact that Wallace College had the discretion to nonrenew the plaintiff's contract for "no cause." Because the plaintiff was not a tenured employee, the defendants' decision could be "for ... a bad reason ... or for no reason at all, as long as [their] action [was] not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Com-*

*munications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Nonetheless, as stated herein, the court finds that the plaintiff has shown by a preponderance of the evidence that the non-renewal of her contract was the product of intentional race discrimination, in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983.[18]

## II. Remedies Available under Title VII and § 1983

The plaintiff seeks declaratory and injunctive relief, including reinstatement, as well as back pay and lost benefits. The plaintiff also seeks attorneys' fees and costs.[19] As indicated previously, the defendants have raised several defenses which affect the availability of the plaintiff's remedies under Title VII and § 1983.

### A. 42 U.S.C. § 1983

#### 1. Failure to Properly Plead a Claim

■ On July 3, 1995, less than two weeks before the trial of this action, the defendants raised as a ground for dismissal that the plaintiff failed to adequately plead her § 1983 claim. Specifically, the defendants state that "one can only deduce from [the plaintiff's] Complaint and other relevant documents that she seeks redress for an alleged violation of her Fourteenth Amendment right to equal protection." In addressing this argument, both the defendants and the plaintiff have referred to the notice pleading standard under Rule 8(a)(2) of the *Federal Rules of Civil Procedure*. However, in § 1983 actions against government officials, courts have rejected this standard and instead impose heightened pleading requirements. *See Malone v. Chambers County Bd. of Com'rs*, 875 F.Supp. 773 (M.D.Ala.1994); *Ross v. State of Ala.*, 893 F.Supp. 1545 (M.D.Ala.1995).

---

17. This case is a perfect example of why in this present day and time, racial epithets, even made in jest, can cause a myriad of problems under the laws passed by the United States Congress in the past twenty years.

18. The defendants assert that, even in absence of race discrimination, they still would have nonrenewed her contract. This "defense" is addressed, *infra*, at 1424–25.

19. The plaintiff seeks neither compensatory nor punitive damages.

■ While the court finds that the plaintiff's complaint does not satisfy the heightened pleading requirement, the court declines to dismiss the § 1983 claim at this stage of the litigation. Generally, to remedy deficient pleadings in § 1983 actions, courts grant a plaintiff leave to amend the complaint to allege more specific facts rather than dismiss the cause of action. *See Arrington v. Dickerson*, 915 F.Supp. 1516, 1516 (M.D.Ala.1996). Obviously, to allow an amendment now would be unnecessary and futile because the case already has been tried. Moreover, the court finds that the defendants had ample opportunity to raise this defense in either a motion to dismiss or a motion for summary judgment but failed to do so. The court finds that to allow the defendants to now succeed on this argument would result in a manifest injustice to the plaintiff.

### 2. Eleventh Amendment Immunity

Under § 1983, the Eleventh Amendment bars the plaintiff's claim against Wallace College and President Bailey, except to the extent that the plaintiff seeks prospective equitable relief from President Bailey in his official capacity.[20] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens of Subject or any Foreign State." U.S. Const.Amend. 11.

### (a) Wallace College

■ Generally, the Eleventh Amendment is a complete bar to lawsuits brought against a state or state agency by individuals in federal court. *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–08, 79 L.Ed.2d 67

(1984) (Eleventh Amendment bar to suit against state and state agencies applies "regardless of the nature of the relief sought."). *See Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). An individual may, however, bring suit if the state unequivocally has waived its immunity or if congressional legislation under § 5 of the Fourteenth Amendment operates as a waiver of the Eleventh Amendment's protection.[21] *Kennecott Copper Corp. v. State Tax Com'n*, 327 U.S. 573, 577, 66 S.Ct. 745, 746, 90 L.Ed. 862 (1946); *Hutto v. Finney*, 437 U.S. 678, 693, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978) (citation omitted). Neither the State of Alabama has waived Eleventh Amendment immunity under § 1983 nor has Congress exercised its authority under § 5. *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990). *See also Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).

■ Hence, the Eleventh Amendment protects Wallace College from liability under § 1983, if it is a state agency. To ascertain whether an entity is an arm of the state, the court must examine state law. *Brown v. East Central Health Dist.*, 752 F.2d 615, 617 (11th Cir.1985) (citations omitted). The Supreme Court of Alabama has held that "'institutions of higher learning,'" including state's community colleges, are arms of the state. *Williams v. John C. Calhoun Community College*, 646 So.2d 1, 2 (Ala.1994); *Shoals Community College v. Colagross*, 674 So.2d 1311, 1313 (Ala.Civ.App.1995), *cert. denied*, 674 So.2d 1315 (Ala.1996) (holding that because Shoals Community College is an Alabama "post-secondary educational institution operating under the authority and supervision of the State Board of Education," it is

**20.** The Eleventh Amendment defines the initial parameters of the court's jurisdiction over the plaintiff's § 1983 claim. Because assertions of immunity under the Eleventh Amendment raise issues concerning subject matter jurisdiction, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 907 n. 8, 79 L.Ed.2d 67 (1984), an Eleventh Amendment claim may be raised at any time. *Id.*; Fed. R.Civ.P. 12(h)(3).

**21.** Section five of the Fourteenth Amendment authorizes Congress to override Eleventh Amendment immunity to the extent necessary to enforce legislation designed to implement the substantive provisions of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).

absolutely immune from suit). Accordingly, because Wallace College is an agency of the State of Alabama, the Eleventh Amendment precludes the plaintiff from maintaining a § 1983 lawsuit against this entity.

#### (b) President Bailey

■ The plaintiff also identifies President Bailey as a defendant in his official capacity. In interpreting the Eleventh Amendment, courts distinguish between suits against a state or state agency and those against state employees. When federal rights are asserted against state employees sued in their official capacities, the Eleventh Amendment prohibits claims for retrospective monetary relief paid from the state treasury but not prospective equitable relief. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that a plaintiff seeking prospective relief from the state must name as a defendant a state official rather than the state or a state agency directly even though in reality the suit is against the state). Hence, the § 1983 claim against President Bailey in his official capacity is proper, and thus, the plaintiff may obtain prospective injunctive relief against him in this capacity. The court now must determine the type of remedies that qualify as prospective injunctive relief.

#### (i) Back Pay and Lost Benefits

■ Prospective injunctive relief does not include back pay and benefits. The Supreme Court of the United States "categorizes this equitable request as a disguised claim for damages that are never recoverable against state employees functioning in their official capacities." *Thomas v. Devries,* 834 F.Supp. 398, 402 (M.D.Ga.1993), *aff'd,* 36 F.3d 95 (11th Cir.1994) (citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). *See also Parker v. Wallace,* 596 F.Supp. 739, 746 (M.D.Ala.1984) ("Any award of backpay from the defendants in their official capacities as state officials, whether viewed as damages ... or an aspect of equitable relief, would be retroactive and must come from the state treasury. Such an award is barred by the eleventh amendment to the U.S. Constitution.") (citations omitted).

Accordingly, the plaintiff may not receive back pay and lost benefits from President Bailey in his official capacity.

■ The plaintiff also seeks back pay from President Bailey in his individual capacity. President Bailey contends that, in his individual capacity, he is immune from such damages under the well-established doctrine of qualified immunity. The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. A government official first must demonstrate that " 'he [or she] was acting within the scope of his [or her] discretionary authority when the allegedly wrongful acts occurred.' " *Rich,* 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). If the defendant satisfies this burden, the plaintiff must show either that the official's actions " 'violated clearly established constitutional law' " or a federal statute. *Id.*

Regarding the first prong of the qualified immunity inquiry, the evidence is undisputed that President Bailey was acting within his discretionary authority when he nonrenewed the plaintiff's contract. The record reveals that President Bailey's actions were undertaken pursuant to the performance of his duties and were within the scope of his discretionary authority. *Hutton v. Strickland,* 919 F.2d 1531, 1536 (11th Cir.1990).

Under the second prong, the court must determine whether the applicable law was clearly established at the time of the chal-

lenged action. This is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and, in this case, the Supreme Court of Alabama. *D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir. 1995); *Courson v. McMillian,* 939 F.2d 1479, 1498 n. 32 (11th Cir.1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994) (De Ment, J.), and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994).

Here, the plaintiff contends that President Bailey discriminated against her based upon her race by failing to renew her contract. The Eleventh Circuit has determined that the equal protection right to be free from intentional racial discrimination is clearly established. *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1478 (11th Cir.1991). This Circuit has since remarked that the illegality of racial discrimination in the workplace is patently obvious. *See Smith v. Lomax,* 45 F.3d 402, 407 (11th Cir.1995).

■ Nevertheless, the court finds that the facts are insufficient to hold President Bailey accountable in his individual capacity. As previously stated, the primary culprit in this case is Ms. Hathcoat. While President Bailey has the final authority in hiring, firing and nonrenewal of contracts, the court has found that Ms. Hathcoat's role in that decision was racial and that President Bailey basically "rubber-stamped" recommendations. There is no evidence, however, indicating that Ms. Hathcoat told President Bailey that he should nonrenew the plaintiff's contract because she is black. In fact, the record is devoid of any evidence regarding Ms. Hathcoat's communication, if any, with President Bailey about the renewal of the plaintiff's contract. Ms. Hathcoat's silence concerning the plaintiff's performance under her contract, if such was the case, may very well have been construed by President Bailey as a recommendation for nonrenewal. In other words, the court finds that, even though President Bailey is the final decision-maker in employment actions, his actual participation in that process is minimal and, in this case, was not racially-motived. The court emphasizes that "a supervisor cannot be held liable on the basis of respondeat superior for the acts of his inferiors under § 1983." *Busby,* 931 F.2d at 782 (citation omitted). Because there is no "causal connection" between President Bailey's "rubber-stamp" nonrenewal of the plaintiff's contract and a deprivation of the plaintiff's equal protection rights, *id.,* the court finds that he is entitled to qualified immunity in his individual capacity.

**(ii) Reinstatement**

■ The plaintiff's § 1983 official-capacity action against President Bailey for an order of reinstatement, however, is not barred by the Eleventh Amendment. *Lassiter v. Alabama A & M Univ., Bd. Of Trustees,* 3 F.3d 1482, 1485 (11th Cir.1993). An order of reinstatement is a type of prospective injunctive relief. *See Edelman,* 415 U.S. at 677, 94 S.Ct. at 1362; *Cross v. State of Alabama,* 49 F.3d 1490, 1503 (11th Cir.1995).

**(iii) Injunctive and Declaratory Relief**

■ Likewise, injunctive and declaratory relief are forms of relief available under § 1983 against President Bailey in his official capacity. *Ross v. State of Alabama,* 893 F.Supp. 1545, 1555 (M.D.Ala.1995).

**(iv) Attorneys' Fees and Costs**

■ Although monetary in nature, the Eleventh Amendment does not prevent the plaintiff from seeking attorneys' fees and costs from either Wallace College or President Bailey. In *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court of the United States held that the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, constituted a congressional abrogation of the states' Eleventh Amendment immunity with respect to the payment of attorneys' fees in civil rights actions.

## B. Title VII

### 1. Individual Capacity Suits

■ Under Title VII, the plaintiff can only recover against Wallace College, not President Bailey. First, the defendants argue, and the plaintiff concedes, that President Bailey may not be held liable in his individual capacity under Title VII. In the Eleventh Circuit, "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) (per curiam) (citations omitted) (emphasis in original); *see also Bahadirli v. Domino's Pizza*, 873 F.Supp. 1528, 1533 n. 2 (M.D.Ala.1995).

Second, the plaintiff likewise concedes that her Title VII claim against President Bailey in his official capacity is repetitious since her employer, Wallace College, is properly named as a defendant. *Bahadirli*, 873 F.Supp. at 1534; *see also Grant v. Bullock County Bd. of Educ.*, 895 F.Supp. 1494, 1499 (M.D.Ala.1995). In other words, no additional relief may be obtained by naming President Bailey in his official capacity as a defendant to the Title VII action.

Accordingly, the court finds that all claims against President Bailey, individually and in his official capacity, are due to be dismissed. The plaintiff's Title VII action, however, proceeds as to her claim against Wallace College.

### 2. Relief available under Title VII

■ As opposed to actions brought under 42 U.S.C. § 1983, the Eleventh Amendment is not a bar to the plaintiff's Title VII claim against Wallace College. *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir.1987). Under Title VII, the plaintiff may seek back pay (plus interest), injunctive and declaratory relief, as well as costs and attorneys' fees. 42 U.S.C. § 2000e–5(g) & (k).[22]

■ However, the defendants assert that, under Title VII, if the court finds that, in the absence of race discrimination, they nonetheless would not have renewed the plaintiff's contract, then 42 U.S.C. § 2000e–5(g)(2)(B) limits the remedies available to the plaintiff. Pursuant to the 1991 amendments to Title VII, if the plaintiff shows that race played a "motivating factor" in the adverse employment action, liability is established. 42 U.S.C. § 2000e–2(m). However, if an employer then "demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor," the court

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and,

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e–5(g)(2)(B).[23]

These statutory sections apply in intentional discrimination cases based upon a mixed-

**22.** 42 U.S.C. § 2000e–5(g) provides, in part, as follows:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer ... responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earn-

ings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C. § 2000e–5(k) provides that "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party a reasonable attorney's fee (including expert fees) as part of the costs."

**23.** Congress enacted 42 U.S.C. § 2000e–5(g)(2)(B) to overrule, in part, the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In mixed-motive cases, where both legitimate and discriminatory reasons exist for the employment decision, the Supreme Court had

motives theory of liability. The mixed-motives analysis "is limited to employment decisions where legal and illegal motivations are involved." *Gilligan v. Department of Labor,* 81 F.3d 835, 840 (9th Cir.1996); *Hicks v. Dothan City Bd. of Educ.,* 814 F.Supp. 1044, 1047–48 (M.D.Ala.1993). The court finds that, even if this action is treated as a mixed-motives case, the defendants have not shown that, in the absence of race, they still would have nonrenewed the plaintiff's contract. In other words, the court finds that the plaintiff's version of the facts is more likely. to have occurred than the defendants' version of the facts. Hence, the defendants cannot succeed under the mixed-motives defense.

The court further emphasizes that throughout this litigation, both the defendants and the plaintiff have treated this case as one proceeding under a pretext theory of liability. In both the pre-trial and post-trial briefs, as well as during argument at trial, the parties have consistently applied the *McDonnell Douglas* three-part burden-shifting analysis, which is used in disparate treatment cases based upon a pretext theory. As discussed *supra,* the court finds that, under *McDonnell Douglas,* the plaintiff has shown that the nonrenewal of her. contract more likely than not was because of her race and not because of the various reasons asserted by the defendants.

## C. Relief

The following chart summarizes the remedies available against Wallace College and President Bailey:

| | Title VII | 42 U.S.C. § 1983 |
|---|---|---|
| Reinstatement | Wallace College | Dr. Bailey in his official capacity |
| Back Pay | Wallace College | |
| Declaratory Judgment | Wallace College | Dr. Bailey in his official capacity |
| Injunctive Relief | Wallace College | Dr. Bailey in his official capacity |

Having determined that the defendants unlawfully discriminated against the plaintiff and that the plaintiff is entitled to relief, the question now becomes what relief is appropriate.

### 1. Back Pay

While the award of back pay under Title VII is within the court's sound discretion, such relief "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (footnote omitted); *see also Hearn v. General Electric Co.,* 927 F.Supp. 1486, 1499 (M.D.Ala.1996) (Thompson, J.) (Prevailing plaintiffs "are presumptively entitled to backpay and other back benefits they would have

received had they not been" the victim of unlawful discrimination) (citing *Lengen v. Department of Transp.,* 903 F.2d 1464, 1468 (11th Cir.1990)). Here, the court finds that a back pay award is necessary in order to make the plaintiff whole and that the defendants have failed to set forth any circumstances that warrant the denial of such relief.

Accordingly, the court will order Wallace College to award the plaintiff back pay in an amount equivalent to the salary, plus the statutory-allowed benefits, that the plaintiff would have received had her contract been renewed for a second nine-month period. This amount, of course, should be reduced by any "[i]nterim earnings or amounts earnable with reasonable diligence" by the plaintiff. 42 U.S.C. § 2000e–5(g). *See generally Ford Motor Co. v. Equal Employment Opportunity Comm'n,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d·721 (1982) (duty to mitigate damages under Title VII requires

prohibited the plaintiff from receiving any relief if the trier of fact determined that discrimination, while present, played no role in the adverse employment decision. *Id.* at 258, 109 S.Ct. at 1794–95. The Civil Rights Act now allows a plaintiff partial recovery in the form of declarato-

ry and injunctive relief and limited attorneys' fees and costs. *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995); *see also Hicks v. Dothan City Bd. of Educ.,* 814 F.Supp. 1044 (M.D.Ala. 1993).

plaintiff to use reasonable diligence in finding other suitable employment). The court encourages the parties to agree upon the appropriate amount. If the parties cannot reach an agreement, however, then the court will make the determination.

2. Reinstatement

 Whether reinstatement should be ordered also is within the sound discretion of the trial court. *See Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). Despite the plaintiff's testimony that she desires reinstatement, the court finds that this remedy is not appropriate in this case. Because the position which the plaintiff occupied was filled by Ms. Smith (and because there is nothing in the record to indicate that the position is not presently filled), reinstatement would require "bumping" an incumbent employee. The court is sensitive to the fact that, it "may, in its discretion, require the bumping of an employee if necessary to make a Title VII plaintiff whole." *Walters v. City of Atlanta*, 803 F.2d 1135, 1148 (11th Cir.1986). However, "[b]umping' is an extraordinary remedy to be used sparingly and only when a careful balancing of the equities indicates that absent 'bumping,' plaintiff's relief will be unjustly inadequate." *Id.* at 1149.

The court finds that, not only would reinstatement work a substantial hardship on Ms. Smith or any other innocent individual who now occupies the instructor position, but also that the discriminatory and continuously-tense relationship between the plaintiff and Wallace College officials most likely would intensify if the plaintiff were reinstated. In specific terms, if reinstated, the plaintiff would have to work closely with Ms. Hathcoat, one of the individuals against whom the plaintiff has accused of race discrimination. During the trial, the court sensed that Ms. Hathcoat harbored some resentment against the plaintiff because of the racial allegations lodged against her in this litigation. This resentment could very likely lead to an antagonistic relationship between Ms. Hathcoat and the plaintiff. Moreover, Ms. Hathcoat may develop even more hostility toward the plaintiff due to the court's questioning of, if not outright rejection of, Ms. Hathcoat's vehement denial of any racial prejudice on her part. If either Ms. Hathcoat or other officials at Wallace College recriminated against the plaintiff due to this lawsuit, which is not uncommon, the court finds that the plaintiff would be in a much worse situation than when previously employed. In sum, in this case, the court finds that the effectiveness of reinstatement in making the plaintiff whole is highly questionable.

Finally, the court notes that, while it does not criticize the plaintiff's extraordinary ambition, from 1979 to 1992, the plaintiff has held fifteen different jobs, voluntarily leaving each one to accept a more beneficial offer of employment. Because the plaintiff, on the average, holds a single job for less than a year, it is reasonable to infer that she would not remain employed at Wallace College for an appreciable period of time.

For the above-stated reasons, the court finds that, in this case, reinstatement is not an appropriate remedy and that an award of back pay will more adequately and wholly redress the plaintiff for any discriminatory treatment. Accordingly, the court finds that the purposes of the statutes at issue would not be frustrated by denying reinstatement.

3. Injunctive Relief

Because the court, in its discretion, has declined to order reinstatement, it finds that an injunction is unnecessary for a just disposition of this action. Since this is a disparate treatment case involving one individual who claims her contract was nonrenewed for racial reasons, not a class-based action, no one besides the plaintiff can possibly benefit from the injunctive relief requested. Moreover, the court further finds that the plaintiff has secured an adequate redress through back pay and that the monetary award is sufficient to induce the defendants to cease any further discriminatory acts.

4. Declaratory Judgment

 The plaintiff also seeks a declaratory judgment establishing that her rights protected by Title VII and the United States

Constitution have been violated. Despite the defendants' objection, the court finds that such relief is appropriate for purposes of "vindication," particularly since the defendants have persistently denied any wrongdoing throughout this litigation. *Landgraf v. USI Film Products,* 968 F.2d 427, 432 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (citation omitted). In sum, the court finds that the harm suffered by the plaintiff is sufficient to establish a right to a declaratory judgment.

### 5. Attorneys' Fees

■ Because the plaintiff is a "prevailing party," the court will award her attorneys' fees under 42 U.S.C. § 1988 and Title VII, to be determined in accordance with the criteria established in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

An appropriate judgment will be entered in accordance with the memorandum opinion.

### *JUDGMENT*

Pursuant to Rule 58 of the *Federal Rules of Civil Procedure* and in accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT and DECREE of the court:

(1) That under 42 U.S.C. § 1983, all claims against Defendants Wallace State Community College and James C. Bailey, in his individual capacity, be and the same are hereby DISMISSED WITH PREJUDICE;

(2) That under Title VII, all claims against Defendant James C. Bailey be and the same are hereby DISMISSED WITH PREJUDICE;

(3) That judgment be and the same is hereby ENTERED in favor of Plaintiff Wendolyn LaFleur, and against Defendant Wallace State Community College as to the Title VII claim, and against Defendant James C. Bailey in his official capacity as to the 42 U.S.C. § 1983 claim;

(4) That it is DECLARED that, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17, race was a motivating factor in Defendant Wallace State Community College's decision to nonrenew the plaintiff's contract and that Defendant Wallace State Community College has not shown that, in the absence of race, it still would have nonrenewed the plaintiff's contract;

(5) That it is DECLARED that Defendant James C. Bailey, in his official capacity as the employing authority for Wallace State Community College, nonrenewed the plaintiff's contract based upon the intentional race discrimination of a certain employee of Wallace State Community College, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983;[24]

(6) That the plaintiff be and the same is hereby DENIED reinstatement to her previous position;

(7) That the plaintiff is to have and recover from Defendant Wallace State Community College such back pay and employment benefits she would have received for a nine-month contract during the 1993–94 academic year had she not been illegally discriminated against because of her race;

(8) That if the parties cannot agree on the appropriate back pay and other back employment benefits, the plaintiff is allowed twenty-eight days from the date of this order to file a request for the court to determine the amount of back pay;

(9) That the plaintiff is to have and recover from Defendants Wallace State Community College and James C. Bailey, in his official capacity, reasonable attorneys' fees;

(10) That the parties first should endeavor to stipulate to the appropriate amount of attorneys' fees, subject to their right of appeal and the approval of this Court; but if the parties cannot agree on reasonable attorneys' fees, the plaintiff is allowed twenty-eight days from the date of this order to file a motion, along with the appropriate supporting documentation, for the court to determine such fees;

---

**24.** The judgment against Defendant James C. Bailey in his official capacity is, in reality, a judgment against Wallace State Community College. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

(11) That costs be and the same are hereby taxed against Defendants Wallace State Community College and James C. Bailey, in his official capacity, in favor of the plaintiff, for which let execution issue, and that a Bill of Costs shall be submitted to the Clerk of the Court within twenty-eight days from the date of this order; and

(12) That the court retains jurisdiction over this action to award reasonable attorneys' fees and costs, and appropriate back pay.