Sanquita Chyverne ALEXANDER,
Plaintiff,

v.

CHATTAHOOCHEE VALLEY COMMUNITY COLLEGE and Dr. Laurel Blackwell, etc., Defendants.

Civil Action No. 3:03cv192–T.

United States District Court,
M.D. Alabama,
Northern Division.

July 9, 2004.

Afrika C. Parchman, Terry G. Davis, Davis & Hatcher, LLC, Montgomery, AL, William Don Eddins, W. Don Eddins, Attorney at Law, Auburn, AL, for Plaintiff.

J. Victor Price, Jr., Tallassee, AL, John J. Park, Jr., Sandra Ingram Speakman, Margaret L. Fleming, Office of Atty. Gen., Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Sanquita Chyverne Alexander, an African–American woman, brought this lawsuit against defendants Chattahoochee Valley Community College and Laurel Blackwell; she sues Blackwell individually and in her official capacity as president of the community college. Alexander claims that Chattahoochee Valley and Blackwell refused to promote her on four occasions because of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and the equal protection clause of the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983; Alexander also claims that the community college and Blackwell discriminated against her in pay because of her race and sex, in violation of Title VII, the equal protection clause, and the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d).[1] She also brings state-law claims based on state-pay regulations and statutes, 1975 Alabama Code §§ 16–

---

1. In support of all her federal claims, Alexan-    der also relies on the Civil Rights Act of 1866,

22–13.2(4) and 16–22–11(3), and Alabama contract law.[2] Jurisdiction over Alexander's federal claims is proper under 42 U.S.C.A. § 2000e–5 (Title VII), 28 U.S.C.A. §§ 1331 (general federal question) and 1343 (civil rights), and 29 U.S.C.A. § 201(b) (Equal Pay Act); supplemental jurisdiction over the state-law claims is proper under 28 U.S.C.A. § 1367.

This case is currently before the court on Chattahoochee Valley and Blackwell's motion for summary judgment. The motion will be granted in part and denied in part.

## I. SUMMARY–JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

Alexander has a Bachelor's Degree in office management and a Master's Degree in human resources management. In 1990, Chattahoochee Valley hired her as an Admissions Clerk in its Admissions Office.

Chattahoochee Valley's Admissions Office differed from the admissions offices of many other colleges in two ways. First, the community college had no registrar; instead, the Admissions Office performed the duties that are often assigned to a registrar, such as registration and keeping student records. Second, the Admissions Office was not in charge of recruiting new students.[3]

---

as amended, 42 U.S.C.A. § 1981. However, her § 1981 claims against the community college and Blackwell (in both her individual and official capacities) effectively merge into her § 1983 claims. Jett v. Dallas Independent School Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989); Busby v. City of Orlando, 931 F.2d 764, 771 n. 6 (11th Cir.1991); Felton v. Polles, 315 F.3d 470, 482 (5th Cir.2002); Ebrahimi v. City of Huntsville Bd. of Educ., 905 F.Supp. 993, 995–96 (N.D.Ala.1995). Therefore, the court has not considered her § 1981 claims separately from her § 1983 claims.

2. In her complaint, Alexander sets forth her claims very broadly; she does not specify which facts allegedly support violation of which laws. The court has construed her pleadings liberally in determining which claims she is bringing.

3. Hawsey affidavit, exhibit D to evidentiary record, filed Oct. 23, 2003 (Doc. no. 22), p. 16.

*2002 Appointment of Joan Waters as Student Services Director:* In June 2002, Admissions Director Patricia Weeks resigned. President Richard Federinko then reorganized the college's administrative structure; he abolished the position of Admissions Director and placed the Admissions Office in a newly created Student Services Division. He appointed Joan Waters, a white woman who had been Financial Aid Director, to be Student Services Director. He gave Waters and other college directors pay raises.[4]

On June 30, 2002, Federinko retired, and, the next day, Blackwell was appointed Acting President. Blackwell immediately contacted Roy Johnson, the Acting Chancellor of the state postsecondary system, because she was concerned that the procedures Federinko had followed for the reorganizations and pay raises did not comport with the *Shuford* consent decrees, which set forth requirements for hiring in Alabama's postsecondary educational system. *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511 (M.D.Ala.1994); *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535 (M.D.Ala.1995).[5]

On July 11, 2002, Chancellor Johnson visited the community college and met with Blackwell. Johnson told Blackwell and other affected employees that the procedures Federinko had followed were flawed and that he was setting aside the changes Federinko had made. According to Blackwell, Johnson "charged [her] with

reevaluating the staffing patterns of the college."[6]

As a result, Waters was removed as Student Services Director. She had served in the position for about one month and had not yet received an increase in pay.

*2002 Appointment of Vicki Hawsey as Acting Admission Director:* On July 12, 2002, the day after Waters was removed as Student Services Director, Blackwell appointed Vicki Hawsey, a white woman who was the Vice President and Dean of Students, to serve as Acting Director of Admissions as well.

On July 18, Hawsey met with Alexander and the two other Admissions Clerks, Rita Cherry and Debbie Faison. The four divided up the tasks that Weeks had previously performed as Director of Admissions, with all four taking on some new responsibilities.

*2003 Appointment of Alicia Taylor as Acting Admissions Director:* In late July or early August 2002, Alexander wrote a letter to Blackwell expressing her interest in applying for the Admissions Director position. On August 26, Blackwell's administrative assistant wrote back, thanking Alexander for her "letter of application for the position of Director of Admissions" but advising that, at that time, "there is no position announced, nor has this position been advertised."[7]

**4.** Defendants' memorandum in support of motion for summary judgment, filed Oct. 23, 2003 (Doc. no. 21), p. 5.

**5.** There were two consent decrees entered in the Shuford case: *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511 (M.D.Ala. 1994) ("Shuford I"), which resolved race discrimination claims, and *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535 (M.D.Ala.1995) ("Shuford II"), which resolved sex discrimination claims. Shuford I

expired by its own terms on March 15, 2001. Order, *Shuford v. Alabama State Bd. of Educ.,* No. 2:89–cv–196–MHT (M.D.Ala. Aug. 2, 2002). Shuford II is set to expire on December 31, 2005. 897 F.Supp. 1535, 1584.

**6.** Blackwell 2003 deposition, exhibit C to evidentiary record in support of defendants' motion for summary judgment, filed Oct. 23, 2003 (Doc. no. 22), p. 36.

**7.** Plaintiff's exhibit 2 to *id.*

In February 2003, Chattahoochee Valley announced that the position of Director of Admissions and Records was available, and Alexander applied for the job. The job description for the position included some functions for which the Admissions Director was not previously responsible; specifically, the Admissions and Records Director was charged with coordinating and supervising the recruitment of students and with coordinating a "dual enrollment" program in which high school students could take classes at the community college.

The community college appointed a five-member committee to screen applicants for Admissions and Records Director.[8] The committee received 31 applications, and, after eliminating those applicants who did not meet minimum qualifications, interviewed eleven. The committee then forwarded the names of the top three applicants to Blackwell.[9] All three top applicants were African–American; two were women, and one was a man.[10] Alexander was one of the top three.

On September 1, 2003, Blackwell was appointed President of Chattahoochee Valley, and, on that same day, Hawsey left Chattahoochee Valley to become President of Wallace Community College–Hanceville. The State Department of Postsecondary Education loaned Alicia Taylor, its Director of Academic Affairs, to replace Hawsey as an Interim Vice President and Dean of Students. Taylor, who is a white woman, also served as Acting Admissions Director, as Hawsey had done.

*2003 Decision by Laurel Blackwell Not to Fill the Admission and Records Director Position:* On September 9, Blackwell interviewed the three top applicants selected by the committee for the Admissions and Records Director position. However, she did not hire any of them; instead, made the decision to close the search and left the position vacant. Blackwell also decided to rearrange the community college's administrative structure. Instead of one dean, she decided to hire two deans: a Dean of Instruction and a Dean of Student and Administrative Services.[11]

In January or February 2004, Taylor, who had been serving as the college's only dean, left. In January 2004, James Lowe, who is black, was hired as Interim Dean of Instruction. In February 2004, David Hodge, who is Native American, was hired to be the Dean of Student and Administrative Services. The staff of the Admissions Office now reports directly to Hodge; there is no Admissions Director.

8. Consistent with the requirements of the *Shuford* consent decrees, the committee's membership was 40% African–American and 66% female.

9. The procedure of appointing a committee to screen applicants and to forward the names of qualified applicants to the ultimate decisionmaker was done in order to comply with the *Shuford* consent decrees.

10. The other eight applicants who were interviewed by the committee were all white.

11. It is not clear when Blackwell made the decision not to fill the Admissions and Records Director position. In an affidavit she signed on October 22, 2003, Blackwell states that she had "decided not to select any of the candidates that the search committee certified for the position. Instead, I have left the position of Director of Admissions vacant." Blackwell Affidavit, exhibit F to evidentiary record, filed Oct. 23, 2003 (Doc. no. 22), ¶ 10. Blackwell advertised for the positions of Dean of Instruction and Dean of Student and Administrative Services on October 26, 2003. Plaintiff's exhibits 2 and 3 to Blackwell 2004 deposition, exhibit O to evidentiary submission, filed Mar. 10, 2004 (Doc. no. 65). It is not clear whether Blackwell's decision to close the search for the Admissions and Records Director position was made at the same time as her decision to move towards a two-dean structure or not.

## III. DISCUSSION

As stated above, Alexander has three groups of claims: failure to promote based on race, discriminatory pay based on race and sex, and state-law claims. The court will address each category of claims in turn.

### A. Failure–to–Promote Claims

Alexander claims that, on four separate occasions, the defendants refused to promote her because of her race: (1) the 2002 appointment of Waters as Student Services Director; (2) the 2002 appointment of Hawsey as Acting Admissions Director; (3) the 2003 appointment of Taylor as Acting Admissions Director; and (4) the 2003 decision not to fill the position of Admission and Records Director. As noted, Alexander's failure-to-promote claims are premised on Title VII and the equal protection clause.

Alexander's failure-to-promote claims are analyzed using the familiar *McDonnell Douglas* burden-shifting technique. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, the plaintiff has the initial burden of establishing a prima-facie case of unlawful discrimination by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The plaintiff's prima-facie case raises a presumption of illegal discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (en banc).

If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for its employment action. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997). "This intermediate burden is 'exceedingly light.'" *Id.* (quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)). The defendant has a burden of production, not persuasion, and does not have to persuade a court that it was actually motivated by the reason advanced. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253–55, 258, 101 S.Ct. at 1093–94, 1096.

Once the defendant satisfies this burden of production, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024 (internal citations omitted).

However, the establishment of a prima-facie case does not, in itself, entitle the plaintiff to defeat a summary-judgment motion. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1389 (11th Cir.1983). After the defendant proffers a nondiscriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037.

Alexander characterizes her race discrimination claims as one ongoing discriminatory pattern, in which the defendants repeatedly filled the Admissions Director

position, or something comparable to it, with white women while refusing to hire her for the position. However, while the overall course of events is certainly relevant, because the *McDonnell Douglas* approach is designed to focus the court's inquiry on the reasons for a particular decision, the court will analyze separately each of the four individual decision that Alexander challenges as discriminatory.

### 1. 2002 Appointment of Waters as Student Services Director

■ With regard to the elimination of the Admissions Director position and the appointment of Waters as Student Services Director in June 2002, Alexander has established a prima-facie case of racial discrimination. In order to make out a prima-facie case of discrimination, Alexander need show only the following: (1) she is a member of a protected class, (2) she was qualified for the position, (3) she was denied the position, and (4) some additional factor that would allow an inference of discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094 (1981) (requiring that a plaintiff show "circumstances which give rise to an inference of unlawful discrimination").

Alexander is a member of a protected class; she is an African–American. She was qualified for the position of Admissions Director, as was later shown when the committee selected her as one of the top three applicants for the position; she was denied the position; the position was eliminated; and its responsibilities were assigned to a new job title, Director of Student Services.

Many formulations of the *McDonnell Douglas* prima-facie case require that the plaintiff show she applied for the position. However, the Eleventh Circuit Court of Appeals has emphasized that the elements that make up a prima-facie case are not meant to be rigid or inflexible. *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999). To be sure, Alexander did not apply for Admissions Director or the Student Services Director; however, she could not have done so, since the vacancy was not advertised and the community college did not accept applications from anyone. In such a situation, it is enough that a plaintiff show she would have applied for a position had she known it was available. *See Taylor v. Canteen Corp.,* 69 F.3d 773, 781 (7th Cir.1995) (holding that plaintiff could establish a prima-facie case even though he did not apply for the job in question since the evidence showed he would have applied if he had known of the vacancy); *Davis v. State Dept. of Health,* 744 F.Supp. 756, 761 n. 2 (S.D.Miss.1990) (noting that although plaintiff did not apply for position in question, this is "of no moment in this particular case for defendants never sought or obtained applications from anyone"). Further, although it may be that not every person who was qualified for a position but did not know it was available can make out a prima-facie case of discrimination, there is the added fact in this particular case that Alexander was already employed in the Admissions Office and, according to her (albeit disputed by Chattahoochee Valley and Blackwell), was performing many of the duties of Admissions Director.[12] Given these cir-

---

**12.** Alexander maintains (and the defendants dispute) that her duties were as follows: Before Week's resignation, Alexander was "next in charge" when Weeks was absent; after Weeks resigned, and in line with this practice, Alexander performed "all the essential functions" of the Admissions Director. Upon Weeks's departure, Alexander performed 17 of the 20 duties listed in a job description for Admissions Director. Two of the other three duties were never actually performed by the Admissions Director, and the last Acting Admissions Director performed the last duty, approving candidates for graduation, only after Alexander evaluated the candidates for graduation and made recommendations to her. Plaintiff's second supplemental brief in

cumstances, Alexander has made out a prima-facie case even though she did not apply for the position.

Alexander's prima-facie case is also complicated by the fact that the position to which Waters was appointed was not the same Admissions Director position for which Alexander was qualified. Alexander has not shown that she was qualified for the Student Services Director. Nonetheless, the court finds that Alexander has made a prima-facie case by showing that she performed many of the duties of Admissions Director and that the position was eliminated and its functions were given to a white person. In a situation analogous to this, the Eleventh Circuit found that a plaintiff had established a prima-facie case. In *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994), the plaintiff, a female civilian employee of the Army, held the position of Chief of the Production, Planning, & Control Division at Anniston Army Depot. She showed that she was qualified for the higher-ranked position of Deputy Director of Supply, but that her supervisor decided to eliminate that position and to create a new job description that merged the functions of that position with the functions of the chief of another division. The man who was the chief of the other division was promoted to the new position. The Eleventh Circuit said that, given these facts, it was "uncontroverted" that the plaintiff had established a prima-facie case; the court also held that

summary judgment for the defendant was inappropriate.

The fourth element of a prima-facie case is the existence of some other factor which allows for an inference of discrimination. There are several such factors present here. Alexander alleges (although Chattahoochee Valley and Blackwell dispute) that she began to perform the functions of Admissions Director even though the position was officially eliminated. A person outside Alexander's protected class, namely Waters, a white person, was placed in the newly created Student Services Director position. Federinko reorganized the positions and placed Waters in the new position without accepting applications for the new position, in violation of the normal practice of the college and allegedly in violation of the *Shuford* consent decrees, which were meant to prevent discrimination on the basis of race and sex. Indeed, the pattern of college presidents filling positions without advertising them or accepting applications was exactly the practice that the plaintiffs in the *Shuford* case cited as allowing or encouraging discrimination to occur. *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511, 1514 (M.D.Ala.1994); *Shuford v. Alabama State Bd. of Educ.*, 897 F.Supp. 1535, 1544 (M.D.Ala.1995).[13]

Since Alexander has met her burden of showing a prima-facie case of discrimination, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory

opposition to defendants' motion for summary judgment, filed Mar. 8, 2004 (Doc. no. 63), pp. 3–4.

Actually, the Admissions Director job description included in the evidentiary materials filed with the court lists 21 duties; the one missing from Alexander's list is "Supervises the processing of all drop/adds and withdrawals each semester." In her deposition, Alexander stated that all Admissions Office employees processed "drop/adds and withdrawals," but that she was responsible

for filing them. Alexander deposition, exhibit 1 to plaintiff's brief in opposition to motion for summary judgment, filed Dec. 17, 2003 (Doc. no. 33), pp. 39–40.

**13.** Of course, a violation of a consent decree entered in another case is not by itself a violation of Title VII. However, a failure to follow normal procedures can be evidence of discrimination. *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1108 (11th Cir. 2001).

reason why the Director of Admissions position was eliminated and Waters was placed in the new Director of Student Services position. The defendants have not met this "exceedingly light" burden of production. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997). The defendants have not offered any reason at all as to why this was done.

Instead, the defendants argue that Alexander could not have been promoted in 2002, since, under the terms of the *Shuford* consent decrees, a search had to be conducted first. However, this raises the question of how Waters could be appointed Director of Student Services before a search was conducted. Indeed, given that the *Shuford* consent decrees require searches to be conducted so that discrimination does not occur, the defendants' argument that a plaintiff cannot prove discrimination occurred because no search was conducted is somewhat ironic.

Of course, there are valid reasons to eliminate a position, and there are valid reasons to appoint a person to a position without first conducting a search: for instance, the *Shuford* consent decrees recognize that temporary appointments are sometimes necessary, and the decrees allow for the appointment of temporary instructional, administrative, or professional employees when "[t]he college is in need of immediately filling an unanticipated vacancy and is making a temporary appointment for a period of time in order to properly advertise and accept applications for normal 'probationary' appointment to the position." *Shuford v. Alabama State Bd. of*

*Educ.,* 897 F.Supp. 1535, 1581 (M.D.Ala. 1995). However, because the defendants have not articulated any such reason, they are not entitled to summary judgment on this claim.

The circumstances surrounding Waters's appointment are unusual in that the appointment was reversed within a month of when it occurred, albeit partly out of concern that the appropriate procedures had not been followed. While it is commendable that steps were taken to remedy this situation, the doing so cannot serve as an affirmative defense if, indeed, the failure to promote Alexander was discriminatory.[14]

Thus, summary judgment is due to be denied as to Alexander's Title VII claim that, because of her race, she was not promoted her to the position Waters received in June 2002. However, this claim may proceed against only Chattahoochee Valley, and not against Blackwell; Blackwell was not involved in the making of this decision.

### 2. 2002 Appointment of Hawsey as Acting Admissions Director

■ Alexander has also made out a prima-facie case of discrimination with respect to the appointment of Hawsey to the position of Acting Director of Admissions in July 2002. As stated above, Alexander was a black woman and she was qualified for the position. After Johnson reversed Federinko's reorganizations, the position of Admissions Director existed again, but the next day it was filled with a white woman, this time Hawsey, without any application process. Thus, as with the appointment of Waters, Alexander could not have applied for the position.[15]

---

**14.** However, the fact that Waters's appointment was quickly rescinded and the fact that Waters's pay had not been increased could affect the amount of damages for which the defendants would be liable if the appointment is judged to be discriminatory.

**15.** As discussed above, the defendants argue that summary judgment must be granted as to

this decision because Alexander could not have been hired since the community college had not yet done a search for the position. However, because the community college did appoint someone-Hawsey-before conducting a search, its argument that it could not appoint Alexander fails.

Chattahoochee Valley and Blackwell have met their burden of production by articulating a legitimate, nondiscriminatory reason why Blackwell appointed Hawsey to serve as Acting Admissions Director in July 2002. Blackwell stated that Johnson had charged her with reevaluating the staffing patterns of the college and that she chose Hawsey because she knew that Hawsey, as the Vice–President and Dean of the college, had the skill and experience to help her do that. She further explained that she had been Acting President for less than two weeks and that it "didn't occur to me to ask anyone other than Dr. Hawsey to assume that job." The defendants also argue that Hawsey's management experience made her "inherently better suited for evaluating staffing patterns than staff, like Alexander," and that Hawsey has a doctoral degree, while Alexander does not.

Because the defendants have met their burden of production by articulating a legitimate, nondiscriminatory reason why Hawsey was appointed, the court's analysis shifts to determining whether Alexander has showed that the defendants' articulated reasons were pretextual. Alexander argues that the written job description for Admissions Director does not include "evaluating staffing patterns," that Hawsey could have helped Blackwell evaluate staffing patterns without being put in charge of the Admissions Office, that Alexander was actually performing most of the duties of Admissions Director, and that the defendants deviated from normal procedures in appointing Hawsey.

Alexander has not provided enough evidence to rebut the defendants' articulated reasons. Alexander does not dispute that Hawsey has more management experience than she does or that her management experience would make her better at evaluating staffing patterns. She argues that the written job description for Director of Admissions did not include "evaluating staffing patterns." However, Alexander does not dispute that Johnson charged Blackwell with the responsibility of evaluating staffing patterns at the community college during his July 2002 visit to the campus to rescind Federinko's reorganizations and pay increases.

Alexander argues that Hawsey could have helped Blackwell evaluate staffing patterns without being placed in the position of Acting Admissions Director. While this is a plausible argument that Blackwell could have made a different choice, it is not evidence of pretext because it does not show that Alexander's stated nondiscriminatory reasons were not her real reasons. Given that Federinko had previously decided to eliminate the Admissions Director position, that the position was newly revived and newly vacant, and that Blackwell had been charged with evaluating staffing patterns after Federinko's decision was reversed, it was reasonable for Blackwell to place a well-qualified person in the position temporarily in order to evaluate the need for that position.

In some cases in which employers have changed the job duties of a position in a way that disadvantaged a plaintiff, courts have concluded that summary judgment was inappropriate. In *Batey v. Stone*, 24 F.3d 1330 (11th Cir.1994), discussed earlier, the Deputy Director position for which the female plaintiff was well-qualified was combined with the tasks of another position, the Chief of General Supply, which was occupied by a man. The plaintiff produced evidence that, although the new "dual-hatted" position essentially merged the responsibilities of the two previous jobs, in designing the "matrices" used to select a candidate for the new job, the employer included primarily the responsibilities of the Chief of General Supply job and few of the those of the Deputy Di-

rector position. A previous supervisor questioned whether it made sense to combine the two jobs at all. Second, the plaintiff produced evidence that the matrices could be used to pre-select the male candidate and to eliminate the plaintiff from consideration. Third, all three of the men who had previously had the plaintiff's job had been promoted to the Deputy Director position; the "break in custom" allowed "the inference that sex was the controlling reason for the merger" of the two positions. *Id.* at 1334–35.

In *Durley v. APAC, Inc.,* 236 F.3d 651, (11th Cir.2000), the plaintiff demonstrated that she was qualified for a promotion to the position of Purchasing Agent. However, the employer combined the functions of the Purchasing Agent position with those of Warehouse Foreman, and promoted a male employee who had worked in the company's warehouse to the position. The evidence showed that the last Purchasing Agent, who was the plaintiff's supervisor, considered her to be familiar with 85% of the duties of the new Purchasing Agent position. The male employee who was promoted lacked administrative and purchasing experience. Further, although the former purchasing agent stated that only 1% of the duties of the new Purchasing Agent position would involve fabrication and welding, after the plaintiff filed a complaint with the Equal Employment Opportunity Commission the employer wrote a job description for the new position which emphasized fabrication and warehouse skills. *Id.* at 656–57.

Finally, in *Arrington v. Cobb County,* 139 F.3d 865 (11th Cir.1998), the fire department employer stated that the reason for not promoting the plaintiff to Deputy Chief was her lack of "operational" experience as an active firefighter. However, the plaintiff produced evidence that the man promoted to Deputy Chief was not actually performing any "operational" tasks, and that when she was the Assistant Chief of the fire department she had performed all of the duties the new Deputy Chief performed. *Id.* at 873–74.

In all of these cases, the plaintiffs produced evidence that the new job did not match the employer's description of it or that the inaccurate description seemed to have been designed post-hoc in order to justify the hiring of someone outside the plaintiff's class. By contrast, Alexander has not produced any evidence that Hawsey did not really evaluate staffing patterns when she was Acting Admissions Director; neither has she produced evidence, such as the testimony of another college employee, to show that Blackwell's justification was developed post hoc.

Alexander also argues that the defendants' reasons are pretextual because she was already performing most of the duties of Director of Admissions and that, while Hawsey was Acting Admissions Director, she visited the Admissions Department approximately only once a week. However, Alexander's evidence does not support her claim that she was performing "most" of the duties of Admissions Director or that Hawsey was not doing much in that role. Alexander admits that Hawsey did perform many tasks as acting director, such as setting the hours for the employees in the Admissions Office, approving candidates for graduation, supervising and planning the registration process on the college level, supervising the Admissions Office, preparing the budget for the Admissions office, and evaluating the employees in the Admissions Office.[16] Further, the evidence shows that all three Admissions Office employees, not just Alexander, took on

---

**16.** Alexander deposition, exhibit 1 to plaintiff's brief in opposition to motion for summary judgment, filed Dec. 17, 2003 (Doc. no. 33), pp. 25, 26, 32, 34, 46, 48.

some additional tasks when Weeks retired as Admissions Director in June 2002.[17]

Finally, Alexander argues that the defendants deviated from their normal procedures in appointing Hawsey without an application process. However, the fact that the position was temporarily filled without an application process is explained by the fact that the position became vacant without warning on July 11, 2002, when Johnson reversed Federinko's decision to eliminate the position. The defendants explained, and Alexander does not dispute, that Blackwell asked Hawsey to take on the position temporarily until Blackwell could decide how to proceed.

For these reasons, the defendants' motion for summary judgment will to be granted as to the appointment of Hawsey as Acting Director of Admissions.

### 3. 2003 Appointment of Taylor as Acting Admissions Director

■ Summary judgment should also be granted on Alexander's challenge to the appointment of Taylor as Acting Director of Admissions on September 1, 2003. Assuming that Alexander has shown a prima-facie case on this claim, Chattahoochee Valley and Blackwell have met their burden of showing a legitimate, nondiscriminatory reason why Alexander was not hired: because the interview process for the permanent director position was not yet completed, Alexander could not have been hired. Taylor was appointed on September 1, 2003, and Blackwell did not interview the final three candidates for the permanent director position until September 9, 2003. As discussed previously, the explanation that no search had been conducted is not enough to entitle the defen-

dants to summary judgment as to the appointment of Waters or Hawsey; but the difference is that Waters was simply placed in a permanent position without any search process, and Hawsey was appointed when no search had yet begun. By contrast, Taylor was appointed on an interim basis while a search for a permanent director was underway.

In order to show pretext, Alexander argues that Taylor was infrequently present in the Admissions Office, that Taylor had no prior experience working in an Admissions Office, that Taylor did not have a Master's Degree in human resources as Alexander does, and that, although Taylor claimed to supervise the employees in the Admissions Office, she did not know the name of the work-study student employed in the office.

To be sure, the appointment of a person who is unqualified for a position instead of a person who is qualified is evidence of pretext. *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1108–09 (11th Cir.2001). However, although the standard is not mentioned in *Bass*, under Eleventh Circuit precedent a mere disparity in qualifications between a rejected and a selected applicant is not enough to show pretext unless the disparity is "so apparent as virtually to jump off the page and slap you in the face." *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir. 2000). Alexander has certainly not shown that Taylor, who had completed all of the coursework for a Ph.D. in Instructional Leadership and had served as the Interim Associate Dean of Academic Affairs and Division Chair of the Math Department at Shelton State Community College, is less

---

**17.** Debbie Faison, one of the other two Admissions Clerks, stated that she took on the tasks of preparing clearinghouse reports and preparing and mailing suspension and probationary letters to students. Faison affidavit, exhibit H to evidentiary record, filed Oct. 23,

2003 (Doc. no. 22). Rita Cherry, the other Admissions Clerk, agreed to handle international students, the Dean's List, the President's List, Phi Theta Kappa, and three other reports. Cherry affidavit, exhibit I to *id.*

qualified than she, let alone so much less qualified that the disparity would "jump off the page and slap you in the face."

The rest of Alexander's argument as to why the proffered reasons for Taylor's appointment are pretextual is related to the fact that Taylor did not spend much time in the Admissions Office. However, this argument does not rebut the defendants' articulated reason for not appointing Alexander to the position—namely, that Taylor was appointed only on an interim basis while the selection process for the permanent position was ongoing. Moreover, as is the case with Hawsey, the evidence shows that Taylor was performing at least some supervisory duties as Acting Admissions Director.

For these reasons, the defendants are entitled to summary judgment on the appointment of Taylor as Acting Admissions Director in September 2003.

### 4. 2003 Decision Not to Fill the Admissions and Records Director Position

Alexander has made out a prima-facie case of discrimination with respect to Blackwell's decision not to fill, and thus not hire her for, the Director of Admissions and Records position in 2003. Alexander is black woman; she applied and was qualified for the position, as evidenced by her being chosen by the committee as one of the top three applicants; and she was not hired.

As stated above, the fourth prong of a prima-facie case is a showing of an "additional factor" that would allow an inference of discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094. Traditionally, in a failure-to-promote case such as this one, the fourth prong involves showing that a person outside the plaintiff's class was hired for the position or that the position remained open and the employer kept looking for applicants. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *E.E.O.C. v. Joe's Stone Crabs*, 296 F.3d 1265, 1273 (11th Cir.2002).

Here, Blackwell decided not to hire any of the top three candidates and then decided to eliminate the position. Blackwell seems to say that she first decided that none of the candidates for the Director position was suitable and then later decided to eliminate the position; she does not state that her desire to eliminate the position was one of her reasons for not hiring any of the applicants. In either case, though, the court concludes that Alexander has made out a prima-facie case. The *McDonnell Douglas* prima facie test, as noted above, "was not intended to be an inflexible rule"; it was designed to simply require the plaintiff to "show[ ] actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (internal citations omitted). The fact that Blackwell advertised the position as open but then, when faced with three black finalists, decided not to hire any of them and then decided to eliminate the position is definitely enough to raise an inference of discrimination.

Because Alexander has met her burden of showing a prima-facie case, the burden shifts to Chattahoochee Valley and Blackwell to articulate a legitimate, nondiscriminatory reason for not hiring her. The defendants have met this burden. Blackwell stated that Alexander (1) possessed no experience with recruitment, (2) interviewed poorly, (3) had a flawed writing sample, (4) had no supervisory experience, and (5) had no experience with budgeting.[18]

---

**18.** Blackwell has also explained her decision to eliminate the position of Admissions and

Alexander has not met her burden of producing "sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (internal citations omitted). Because there are several proffered reasons, the court will address each of them separately.

### a. Lack of recruiting experience

■ As to the stated reason that Alexander had no experience with recruiting, Alexander does not dispute that she does not possess recruiting experience, but rather argues that the defendants added this duty to the job description in order to ensure that she would not get the job. Alexander has not, however, presented evidence to support this assertion, and there is no evidence in the record to suggest that Blackwell decided to add the task of recruitment to the Admissions and Records Director position in order to discriminate on the basis of race, or in order to discriminate against Alexander in particular. Indeed, it is not even clear whether, before she decided to add the task to the job description, Blackwell knew that Alexander did not possess recruiting experience. Further, the court does not find any inconsistencies in Blackwell's explanation of why recruiting experience was necessary. Blackwell explained that, because Chattahoochee Valley is a small college which was at risk of being merged with another school, she wanted to increase the size of the student body and to diversify the kinds of programs offered. Thus, she saw recruiting as "one of the most important functions that I have to supervise now" and intended "to hire a strong Director of Admissions and Records that would lead us to growth of the college." [19]

Several of the defendants' legitimate, nondiscriminatory reasons—namely Alexander's lack of recruiting, budgeting, and managerial experience—could be interpreted to mean that she was not qualified for the position. However, as stated, the fact that Alexander was selected by the selection committee as one of the top three applicants for the position refutes that she was not a qualified applicant. This apparent discrepancy, therefore, requires further explanation. *Arrington v. Cobb County*, 139 F.3d 865, 873 n. 17 (11th Cir.1998) (stating that because the defendants' asserted nondiscriminatory reason, that the plaintiff was not qualified for the position, was "the exact converse of one element of a prima-facie *McDonnell* case of discrimination," the district court should have explained this discrepancy).

The members of the committee who selected Alexander stated in their depositions that all three top applicants possessed the minimal qualifications for the job. However, Dr. Ellen Gunter, one of the committee members, stated that "there is a major area, which was recruitment, that I don't think [Alexander] was really qualified for. But I think for handling the admissions office, yes, I think she could have done an adequate job." [20] As noted

Records Director altogether; she said that she decided to reorganize the administrative structure so that there are two deans instead of one and that she intends that in the future there will be fewer directors. However, as stated earlier, she does not state that her desire to eliminate the Admissions and Records Director position was a reason for her decision not to hire Alexander or one of the other two top candidates. Thus, the court will not analyze Blackwell's later reorganiza-

tion as a legitimate, nondiscriminatory reason which Alexander must show to be pretextual.

**19.** Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65), pp. 33–34.

**20.** Gunter deposition, exhibit S to evidentiary submission, filed March 10, 2004 (Doc. no. 65), p. 18.

above, Alexander does not dispute that she lacks experience in recruiting; as is discussed below, neither does she dispute that she does not have experience with budgeting.

The question then becomes whether Blackwell may reasonably have preferred that a candidate possess this experience, even though it was not absolutely required of applicants. In other words, while the committee's choices may have been minimally qualified for the position, this is not necessarily enough to demonstrate that Blackwell's assessment that Alexander did not have all of the skills and experience she was looking for in a candidate was pretextual. In short, Alexander has not presented evidence to refute that recruiting was an appropriate "preferred," if not "required," qualification.

### b. Poor interview

■ Another reason Blackwell gave for not hiring Alexander was that Alexander gave a poor, "flat" interview. A subjective reason can be a legally sufficient, legitimate, nondiscriminatory reason as long as the defendant "articulates a clear and reasonably specific basis upon which it based its subjective opinion." *Chapman v. AI Transport,* 229 F.3d 1012, 1034 (11th Cir. 2000). Blackwell articulated some reasons for her conclusion that Alexander interviewed poorly, but her explanation was still quite general. She stated that Alexander gave a good answer to one question; she explained that Alexander "was very sequential and talked through her process of graduation and why that was a completed project she took a great deal of pride in." [21] However, Blackwell added that, otherwise, Alexander's answers "did not demonstrate a depth of understanding of

the job and [were] what I would term pretty flat. She did not communicate strongly, nor were … her answers to my questions thoughtful or deep. Specifically, I would tell you … she did not give me answers that indicated a depth of understanding of the responsibilities that would be involved in a director level position." [22]

The court need not decide whether this explanation is too general to constitute a legitimate, nondiscriminatory reason, for, even if it is, Alexander has produced evidence that would tend to show that it was pretextual. Alexander points to evidence that she was highly ranked by the members of the committee who screened and interviewed applicants and that at least one member of the committee stated in a deposition that Alexander interviewed well. This evidence counters Blackwell's assertion that Alexander interviewed poorly and thus supports Alexander's assertion that that reason was pretextual.

### c. Flawed writing sample

■ As to the defendants' assertion that Alexander's writing sample was flawed, Alexander does not dispute that it was flawed but rather says that Blackwell found only one error in it. Alexander adds that Blackwell herself made a spelling error on the form on which she took notes on the applicants' interviews. She also states that one of the other three candidates Blackwell interviewed for Admissions and Records Director also had a flawed writing sample and that Blackwell did not cite this as a reason for not hiring that applicant. [23]

None of these responses is evidence that Blackwell's asserted reason was pretextual. Alexander's writing sample, which was less than a page long, contained several

---

**21.** Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65), pp. 62–63.

**22.** *Id.*

**23.** The court will not use the names of the other two final candidates in order to protect their confidentiality.

errors; even if Blackwell noticed only one, this is still an adequate basis for her conclusion that a less-than-one-page writing sample (in which one could reasonably be expected not to make any mistakes) was unacceptably flawed.[24] Alexander cannot seriously challenge Blackwell's assertion that she would prefer not to hire someone who did not write well, particularly for director-level positions. Neither does the argument that Blackwell herself made a spelling error show that her explanation was pretextual. Blackwell misspelled the first name of one of the three final candidates. However, this misspelling was in Blackwell's handwritten notes on the interviews she conducted with each applicant, and she explained that, if the document had been one intended to be sent out of her office, she would have spell-checked it.[25] This spelling error does not show that Blackwell does not value good writing. Alexander's other argument, that one of the other final candidate's writing samples also contained an error, does not serve to refute the defendants' explanation. Although Blackwell gave other legitimate, nondiscriminatory reasons for not hiring this candidate, she did note that his writing sample contained flaws.[26]

#### d. Lack of supervisory experience

Alexander responds to Blackwell's assertion that she does not have supervisory experience by stating that, in fact, she does supervise the other two Admissions Office employees as well as work-study students in the Admissions Office. While the other two Admissions Office employees deny that Alexander ever supervised them,[27] the facts must be construed in the light most favorable to Alexander. Thus, there is a genuine issue of fact as to whether Alexander does have supervisory experience and whether this nondiscriminatory reason was pretextual.

#### e. Lack of budgeting experience

Finally, Alexander has not responded at all to the charge that she does not have budgeting experience; nor has the court found any evidence in the record that would show this reason to be pretextual. Alexander's resume does not reveal any experience with budgeting.[28]

Admittedly, Blackwell's notes on her interview with Alexander reveal that, when asked about her experience with budgeting, Alexander stated that, as part of her work in the Admissions Office, she orders caps, gowns, and diplomas; she stated that, even though the Admissions Office

24. The errors in Alexander's writing sample were marked with pen on the typewritten page. During Blackwell's deposition, she stated that she marked Alexander's use of the word "perspective" when the correct word was "prospective." Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65), p. 99. There are several other errors marked: "The Admissions office is the backbone to [sic] the community college"; "the Admissions office ... nurtures the soul being [sic] of the college and the community"; "Thus, defeating the purpose and mission to serve and nurture the community in which we live in [sic; sentence fragment]." Plaintiff's exhibit 27 to id. Blackwell stated that she did not mark these and that one of the committee members must have done so. Blackwell did not specifically

state that she noticed these errors, although neither did she state that she did not notice them. But it is still noteworthy that such a short writing sample would have so many errors.

25. Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65), pp. 103–04.

26. *Id.* at 46, 101.

27. Faison affidavit, exhibit H to evidentiary record, filed Oct. 23, 2003 (Doc. no. 22); Cherry affidavit, exhibit I to *id.*

28. Plaintiff's exhibit 20 to Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65).

charges a fee, she has to "make sure we don't go over" and she checks the costs of supplies in order to get the best buy when ordering supplies for the office.[29] But, while this evidence shows that Alexander has experience handling office money, it also shows that she does not have experience with planning, preparing, and managing a budget for an *entire* office. Thus, she has not shown that this reason for not hiring her was pretextual.

### f. Other evidence of pretext

■ Alexander also argues, as evidence of pretext, that the defendants deviated from their normal procedures in filling the Admissions Director position. Specifically, she argues that the defendants put three white women—Waters, Hawsey, and Taylor—in charge of the Admissions Office without conducting a search as required by the *Shuford* consent decrees; then they closed the search process when all three of the top applicants turned out to be black.

Evidence that an employer has deviated from its normal hiring procedures can be evidence of pretext. *Bass v. Board of County Comm'rs*, 256 F.3d 1095 (11th Cir. 2001). In *Bass*, the defendant "disregard[ed] all but one of the factors and qualifications generally taken into consideration and relie[d] solely on a factor which was designed to create 'leeway' for the promotion of people of a certain race." Further, the interviewers "received no training or guidelines to help them evaluate which candidates were best qualified" for the position. *Id.* at 1108. The Eleventh Circuit stated that this was evidence of pretext.

It is undisputed that the Admissions Director position was eliminated, reinstated, and twice filled with interim directors between June 2002 and September 2003; this is presumably out of the ordinary. However, the court has already examined the circumstances surrounding each event and has taken those into account while evaluating each individual decision. As discussed above, the reorganization and the appointment of Waters in 2002 was suspicious enough to raise a question of whether that decision was discriminatory. However, Alexander has not provided evidence to undermine the defendants' explanation that the appointments of Hawsey and Taylor were reasonable because they were only temporary. Further, the decisionmaker in the Waters appointment is no longer at the community college and that appointment was reversed (and notably by Blackwell) because of concerns that the proper procedures were not followed. Thus, the string of appointments is not enough to refute Blackwell's stated reason for not hiring Alexander.

At first blush, the fact that the defendants conducted a search for Admissions Director but then closed the search when the committee chose three black finalists does seem to be strong evidence of discrimination. However, Blackwell offered legitimate, nondiscriminatory reasons as to why she did not hire all three of the candidates. Blackwell's reasons for not hiring Alexander have already been explained. The second candidate, Blackwell said, was a good candidate except for the fact that she had only two years of experience working in an admissions office; Blackwell felt this was not enough experience to qualify her for the director position. The third candidate's current supervisor stated that she could not recommend him for the position, and the candidate also had a flawed writing sample.

Further, Blackwell explained that the fact that she did not hire any of the top three candidates was not, in fact, a deviation from normal procedures; Blackwell has made the decision to close two other

---

**29.** Plaintiff's exhibit 19 to *id.*

searches without hiring anyone after she found all three of the top candidates to be unacceptable, and, most noteworthy, in those instances, all three of the final three candidates were white.[30]

In summary, while Alexander has produced evidence that could show that two of the defendants' proffered legitimate, non-discriminatory reasons for not hiring her—that she interviewed poorly and that she did not have supervisory experience—were pretextual, she has not shown that the other reasons—that her writing sample was flawed and that she lacked recruiting and budgeting experience—were pretextual. When the defendants offer multiple nondiscriminatory reasons for making an employment decision and the plaintiff offers evidence that could show that some of the reasons are pretextual but is unable to refute the remaining reasons, summary judgment in favor of the defendants is appropriate. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (where plaintiff failed to rebut one of the three reasons, defendant was entitled to judgment as a matter of law on charge of impermissible discrimination); *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir.2000) (en banc) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reason-able factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.").

The dissent in *Chapman* suggested that summary judgment might be inappropriate in some cases in which a plaintiff successfully presents evidence of pretext as to some, but not all, of the employer's stated nondiscriminatory reasons. In particular, the dissent stated that such an exception might be appropriate when nondiscriminatory reasons are intertwined and one of the reasons is shown to be pretextual; when the showing of pretext is sufficiently strong to allow a factfinder to conclude that the employer lacks all credibility; when a large number of arguably pretextual reasons are proffered; or when the employer offers both an objective and a subjective reason and the objective one is shown to be pretextual. *Id.* at 1050–51 (Birch, J., dissenting). The majority rejected the idea that such an exception was appropriate in *Chapman*, though it "express[ed] no view on whether [an] exception might exist in some case with different facts." [31] *Id.* at 1037, n. 30.

If such an exception was not available under the compelling facts set out in *Combs* and *Chapman*, it is surely not appropriate in this case. In *Combs*, the

---

**30.** Blackwell 2004 deposition, exhibit O to evidentiary record, filed Mar. 10, 2004 (Doc. no. 65), pp. 123–24.

**31.** The court agrees with the dissent in *Chapman* to the extent the dissent suggests that the rule announced in that case should be subject to exceptions. In particular, if the evidence of pretext as to some of the employer's proffered explanations is strong enough to allow a factfinder to conclude that the employer lacks all credibility, the plaintiff should be able to survive summary judgment without showing that *each* of the employer's proffered explanations is pretextual. This is consistent with common sense and with the Eleventh Circuit's standard pattern jury instructions for civil cases, which instruct jurors that "You should decide whether you believe what each witness had to say ... [and,] ... in making that decision, you may believe or disbelieve any witness, *in whole or in part.*" Eleventh Circuit Pattern Jury Instructions (Civil Cases), Basic Instructions 3 (emphasis added). Thus, a rule that a plaintiff must disprove all of the defendant's proffered explanations *even if* the employer or decisionmaker appears to be lacking all credibility would mean that plaintiffs in employment discrimination cases must prove more in order to avoid summary judgment than plaintiffs in all other civil cases. This conflicts with the rule, announced in *Chapman*, that "the summary judgment rule applies in job discrimination cases just as in other cases." *Chapman*, 229 F.3d at 1026.

plaintiff successfully rebutted two of the defendant's three reasons. In *Chapman,* the defendant's stated reasons for not hiring a 61–year–old applicant were, first, that he had a period of "job skipping," although several of the individuals who were hired had held more jobs in fewer years; and, second, a subjective and possibly stereotypical assessment that he was less "aggressive" in his interview than were the younger applicants. Applying *Combs* and *Chapman,* this court must conclude that Alexander's showing of pretext as to two of the defendants' proffered reasons is not strong enough to call the defendants' credibility into question as a general matter; neither are the legitimate, nondiscriminatory reasons intertwined such that evidence of pretext as to some of them calls into questions the other ones; nor did the defendants offer a large number of pretextual reasons.

Thus, the court concludes that summary judgment in favor of the defendants is appropriate with regard to their failure to hire Alexander for the Director of Admissions and Records position in 2003.

## B. Discriminatory Pay Claims

Alexander claims that the defendants discriminated against her on the basis of her gender and her race by not paying her enough, in violation of the Equal Pay Act, Title VII, and the equal protection clause. The Equal Pay Act, Title VII, and the equal protection clause make it illegal to pay one employee less than another employee on the basis of a discriminatory reason. The Equal Pay Act applies to pay discrimination on only the basis of sex, while Title VII and the equal protection clause also apply to discrimination on the basis of race. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1526 (11th Cir.1992). The laws also differ in several other ways. The Equal Pay Act requires a plaintiff to meet a "fairly strict" burden of proving she did "substantially similar" work for less pay. *Id.* If she can do so, the burden shifts to the defendant to prove an affirmative defense. By contrast, Title VII requires a plaintiff to show a more "relaxed standard of similarity" between the jobs, but the burden never shifts to the defendant. *Id.; Glover v. Kindercare Learning Centers, Inc.,* 980 F.Supp. 437, 443 (M.D.Ala.1997). The standard of review under the equal protection clause is the same as that under Title VII. *Cross v. State of Alabama,* 49 F.3d 1490, 1507–08 (11th Cir.1995).

### 1. Equal Pay Act

■ In order to establish a prima-facie case under the Equal Pay Act, a plaintiff must show that her employer pays different wages to employees of different sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Equal Pay Act, 29 U.S.C.A. § 206(d)(1); *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Arrington v. Cobb County,* 139 F.3d 865, 876 (11th Cir.1998). To establish a prima-facie case, a plaintiff must demonstrate "that the jobs at issue are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent." *Arrington,* 139 F.3d at 876. Further, the prima-facie case focuses "on the primary duties of each job, not duties that are incidental or insubstantial." *Miranda,* 975 F.2d at 1533. Although job titles and descriptions may be considered, the "controlling factor in the court's assessment of whether two jobs are substantially equal must be actual job content." *Arrington,* 139 F.3d at 876.

Thus, in order to establish her prima-facie case, Alexander must identify a male comparator whose job is substantially simi-

lar to hers. She points to two men who are directors at the community college: James Davis, the Director of Auxiliary Services, and John McCoy, the Director of Institutional Advancement. As an Admissions Clerk, Alexander is on a schedule E salary scale, which covers technical and support personnel. Both McCoy and Davis are on a schedule C salary scale, which covers professional personnel other than presidents, deans, and business officers. Employees on schedule E make less than employees on schedule C.

However, Alexander cannot show that her job is substantially similar to either McCoy's or Davis's. She essentially concedes this in her brief when she states that "there is no comparator at the college who performs a job that is identical" to hers. However, she asserts that she can still make out a prima-facie case because the duties she performs "require[ ] a substantially equal amount of skill, effort and responsibility as those of McCoy ... and Davis." [32] She continues, "McCoy's primary job responsibilities include research, planning, and raising revenue for the college. ... Alexander's primary responsibilities include the development, maintenance and safe storage of student records. ... Davis' primary responsibilities ... [are] to maintain the grounds, inventory, campus communication and security." [33]

Clearly, Alexander's job is not substantially similar to either Davis's or McCoy's. The three jobs involve quite different tasks and different skills. Alexander's argument that her job requires a substantially similar amount of skill, effort, and responsibility is essentially a "comparable worth" claim, or a claim that her job has the same "intrinsic worth or difficulty" as Davis's or McCoy's even though it involves doing different work. *County of Washington v. Gunther,* 452 U.S. 161, 166 and n. 6, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981). Comparable worth theory posits that pervasive sex discrimination and sex segregation in the workplace has led to workers doing traditionally "women's work" being paid less than workers doing traditionally "men's work," even though the jobs might actually require the same level of skill or difficulty. Whatever its merits as a theory may be, courts have held that comparable worth claims are not cognizable under either Equal Pay Act or Title VII. *Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 801 (11th Cir.1992); *Int'l Union, UAW v. Michigan,* 886 F.2d 766, 768–69 (6th Cir.1989); *American Nurses' Ass'n v. Illinois,* 783 F.2d 716 (7th Cir.1986); *AFSCME v. Washington,* 770 F.2d 1401 (9th Cir.1985) (Kennedy, J.); *Plemer v. Parsons–Gilbane,* 713 F.2d 1127 (5th Cir. 1983).

Throughout her briefs, Alexander argues that she performs essentially the same job as did Weeks, who held the Director of Admissions position until June 2002. A comparator in an Equal Pay Act claim may be a person who held the same job as the plaintiff "in succession" with the plaintiff instead of at the same time. *Gosa v. Bryce Hosp.,* 780 F.2d 917, 919 (11th Cir.1986). However, Weeks cannot be Alexander's comparator, since Weeks is also female.

Thus, the defendants are entitled to summary judgment on Alexander's Equal Pay Act claim.

### 2. Title VII and § 1983 discriminatory pay claims

■ Although there is a "relaxed standard of similarity" between the plaintiff's

---

**32.** Plaintiff's second supplemental brief in opposition to defendants' motion for summary judgment, filed March 8, 2004 (Doc. no. 63), p. 20.

**33.** *Id.* at 20–21.

job and the comparator job in a Title VII pay discrimination analysis, *Miranda,* 975 F.2d at 1527, Alexander cannot meet that lighter standard. As explained above, her job is simply too different from the other director jobs to which she compares it for her to be able to show that the jobs are even substantially similar. Neither can Weeks serve as a comparator for Alexander on her race and sex-based wage discrimination claims, since Weeks is also a black woman.[34]

Summary judgment is due to be granted on Alexander's § 1983 equal protection claim for the same reasons.

### C. State-law claims

■ Alexander brings several state-law claims against the defendants. However, Chattahoochee Valley, like other Alabama's other public community colleges, is a state actor. *Morris v. Wallace Community College–Selma,* 125 F.Supp.2d 1315, 1336 (S.D.Ala.2001); *LaFleur v. Wallace State Community College,* 955 F.Supp. 1406, 1421 (M.D.Ala.1996). In her official capacity as the President of Chattahoochee Valley, Blackwell is also a state actor. *Morris,* 125 F.Supp.2d at 1336. Federal courts do not have jurisdiction to order state officials to comply with state law. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984).

Nor are Alexander's state-law claims against Blackwell in her individual capacity proper. As a general matter, the Eleventh Amendment does not protect state employees sued in their individual capacity for violations of state law. *Wilson v. UT Health Center,* 973 F.2d 1263, 1271 (5th Cir.1992) (*"Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against

state officials strictly in their individual capacities."); *cf. Jackson v. Georgia Dept. of Transp.,* 16 F.3d 1573, 1575 (11th Cir. 1994) (existence of State's liability insurance trust fund, voluntarily established to protect its employees against personal liability for damages, does not make State real party in interest for purposes of Eleventh Amendment immunity, so as to immunize employees from state-law persona injury action). However, "when a state official is made a defendant in a suit, whether it is nominally brought against him in his official or individual capacity, a court must determine the real, substantial party in interest." *Harbert Intern., Inc. v. James,* 157 F.3d 1271, 1277 n. 3 (11th Cir.1998). "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* (citations omitted).

Here, while Alexander ostensibly brings her state-law claims against Blackwell in her individual capacity, the court concludes that the State of Alabama is the real, substantial party in interest. *See Clark v. New Mexico Dept. of Corrections,* 58 Fed. Appx. 789, 791 (10th Cir.2003) (State was the real, substantial party in interest in breach of contract claim brought against state officials in their individual capacities). In a true individual capacity suit, the plaintiff seeks to recover from an individual defendant, who will be personally liable for the judgment. *Jackson,* 16 F.3d at 1577. Here, however, if Alexander were to prevail in her claims that Blackwell violated state pay laws and regulations and an "implied contract" by placing Alexander on

---

**34.** Pretrial brief, *Weeks v. Chattahoochee Valley Community College,* No. 3:01–cv–442– SRW (M.D.Ala. Apr. 2, 2002).

the wrong pay scale, the remedy would be not only that Blackwell must pay Alexander a judgment arguably out of Blackwell's own pocket, but also that Blackwell must make sure, on pain of future personal liability, that Chattahoochee Valley itself places Alexander on a different pay scale and raises her pay. In other words, this court would have, in effect, ordered a state official to comply with state law with regard to the management of a state institution. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911. Therefore, the state-law individual-capacity claims against Blackwell are also barred by the Eleventh Amendment.

Thus, the court will dismiss the state-law claims against the community college and Blackwell in both her official and individual capacities without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the court will grant summary judgment against Alexander on all of her federal claims against Chattahoochee Valley and Blackwell except for her Title VII and equal protection claim against Chattahoochee Valley relat-

ing to the 2002 decision to place Waters in charge of the Student Services Department.[35] Alexander's state-law claims against the community college and Blackwell will be dismissed without prejudice.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the opinion entered on this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The motion for summary judgment, filed by defendants Chattahoochee Valley Community College and Laurel Blackwell on October 23, 2003 (Doc. no. 20), is granted on all of plaintiff Sanquita Chyverne Alexander's federal claims against defendants Chattahoochee Valley Community College and Blackwell except her failure-to-promote claim against defendant Chattahoochee Valley Community College for its decision to eliminate the Director of Admissions position and to appoint Joan Waters to Director of Student Services in 2002.

(2) Judgment is entered in favor of defendant Blackwell and against plaintiff Al-

---

**35.** The court notes that, because Chattahoochee Valley is a state actor, it is entitled to Eleventh Amendment immunity from Alexander's remaining federal claim to the extent it is based on the equal protection clause as enforced by § 1983. However, federal courts are not required to raise the issue on their own motion. *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982) ("We have noted that 'the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar' that it may be raised by the State for the first time on appeal. However, because of the importance of state law in analyzing Eleventh Amendment questions and because the State may, under certain circumstances, waive this defense, we have never held that it is jurisdictional in the sense that it

must be raised and decided by this Court on its own motion.") (internal citations omitted); *McClendon v. Georgia Dept. of Community Health*, 261 F.3d 1252, 1257 (11th Cir.2001) ("[U]nlike other jurisdictional bars, federal courts are required to consider whether the Eleventh Amendment strips them of jurisdiction only if the state defendant insists that it does.").

Therefore, because the community college did not make this argument, because federal courts are not required to raise the issue on their own motion, and because state actors are not immune from suit under Title VII, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the court will not address the Eleventh Amendment defense as this time. Though, as stated, the community college is entitled to raise it any time.

exander on all of plaintiff Alexander's federal claims, with plaintiff Alexander taking nothing on her federal claims against defendant Blackwell.

(3) Judgment is entered in favor of defendant Chattahoochee Valley Community College and against plaintiff Alexander on all of plaintiff Alexander's federal claims except her failure-to-promote claim against defendant Chattahoochee Valley Community College for its decision to eliminate the Director of Admissions position and to appoint Joan Waters to Director of Student Services in 2002, with plaintiff Alexander taking nothing on her federal claims against defendant Chattahoochee Valley Community College with this one exception.

(4) The motion for summary judgment, filed by defendants Chattahoochee Valley Community College and Blackwell on October 23, 2003 (Doc. no. 20), is granted on all of plaintiff Sanquita Chyverne Alexander's state-law claims against defendants Chattahoochee Valley Community College and Blackwell, with plaintiff Alexander's state-law claims against defendants Chattahoochee Valley Community College and Blackwell dismissed without prejudice.

It is further ORDERED that this case will proceed to jury trial solely on plaintiff Alexander's failure-to-promote claim against defendant Chattahoochee Valley Community College for its decision to eliminate the Director of Admissions position and to appoint Joan Waters to the Director of Student Services position in 2002.